**TVT RECORDS and TVT Music, Inc., Plaintiffs,**

v.

**The ISLAND DEF JAM MUSIC GROUP and Lyor Cohen, Defendants.**

**The Island Def Jam Music Group, A Division of UMG Recordings, Inc., Counterclaimant,**

v.

**TVT Records, Inc. and Steve Gottlieb, Counterclaim–Defendants.**

**No. 02 CIV. 6644(VM).**

United States District Court, S.D. New York.

Sept. 2, 2003.

See also 262 F.Supp.2d 188.

L.L.P., New York, NY, Peter L. Haviland, Rhonda R. Trotter, Akin Gump Strauss Hauer & Feld, LLP, Los Angeles, CA, Tuneen E. Chisolm, Akin, Gump, Strauss, Hauer & Feld, L.L.P., New York, NY, for TVT Records, TVT Music, Inc.

Michael T. Mervis, Proskauer Rose LLP, Mary Mulligan, Esq., Universal Music Group, New York, NY, for the Island DEF Jam Music Group.

Robert J. Eddington, Proskauer Rose LLP, Michael T. Mervis, Alexander Kaplan, Proskauer Rose LLP, Mary Mulligan, Esq., Universal Music Group, Matthew S. Dontzin, James M La Rossa, New York, NY, for Lyor Cohen.

James E. d'Auguste, James Philip Chou, Akin, Gump, Strauss, Hauer & Feld,

**DECISION AND ORDER**

MARRERO, District Judge.

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | *BACKGROUND* | 372 |
| II. | *FACTS* | 373 |
| III. | *DISCUSSION* | 375 |
| | A. *STANDARDS OF REVIEW* | 375 |
| | B. *DEFENDANTS' RULE 50(b) MOTIONS* | 376 |
| | 1. Tortious Interference With Contractual Relations: Parties to the Heads of Agreement and Economic Justification | 376 |
| | 2. Tortious Interference with Contractual Relations: Scope of Cohen's Employment | 378 |
| | 3. Fraud By Fraudulent Concealment: Duplicative of Breach of Contract and the Defendants' Duty To Disclose | 380 |
| | 4. Copyright Infringement: Validity of the Licenses and Knowledge of Ownership | 381 |
| | 5. Standing of TVT Music, Inc. | 383 |
| | 6. Punitive Damages: Existence of Malice and a Public Aim | 384 |
| | 7. Double Recovery | 384 |
| | 8. Loss of Goodwill | 385 |
| | 9. Loss of Profits | 387 |
| | C. DEFENDANTS' MOTIONS FOR A NEW TRIAL | 390 |
| | 1. Trifurcation of the Trial | 391 |
| | 2. Size of the Awards | 391 |
| | 3. References to Vivendi Universal | 391 |
| | 4. Private Investigator | 392 |
| | 5. Transactional Counsel for Gotti and Murder Inc. | 394 |
| | 6. Comments By TVT's Counsel | 394 |
| | a. Legal Standard | 394 |

 b. Legal Limits on the Size of Punitive Damage Awards .............. 395
 c. Confidential Information and TVT's Independent Dispute with
 Prudential Securities Corp. .................................. 396
 d. Representations Concerning IDJ's Counterclaims................... 398
 e. Enron ..................................................... 399
 f. Subornation of Perjury ......................................... 400
 g. Characterization of Materials Delivered for the CMC Album ........ 402
 h. Pattern of Behavior ........................................... 403
 7. Weight of the Evidence ........................................... 403
 a. Basis for Finding a Breach of the Heads of Agreement ............. 403
 b. Economic Justification ........................................ 405
 c. Validity of the Copyright Licenses for Use of "The Rain" and
 "Get Tha Fortune" ......................................... 406
 D. TVT'S MOTION FOR RETURN, RECALL, AND DESTRUCTION OF
 INFRINGING MATERIALS ....................................... 407
 E. TVT'S MOTION FOR PREJUDGMENT INTEREST..................... 409

IV. CONCLUSION AND ORDER ......................................... 413

## I. BACKGROUND

On August 20, 2002, plaintiffs TVT Records and TVT Music, Inc. (collectively "TVT") commenced this action against defendants The Island Def Jam Music Group ("IDJ") and its chairman Lyor Cohen ("Cohen," and collectively with IDJ, the "Defendants"), alleging copyright infringement and related state law claims arising out of the production of a certain music album. The Court held an evidentiary hearing on September 23, 24, and 30, 2002, after which it granted in part and denied in part TVT's motion for a preliminary injunction essentially prohibiting any use of disputed album materials pending final resolution of the surrounding issues, including ownership, at trial. Trial of the parties' dispute commenced on March 10, 2003 in bifurcated liability and damages phases before the same jury. On March 21, 2003, the jury returned a verdict of liability against IDJ for breach of contract and against both Defendants for tortious interference with contractual relations, fraud by fraudulent concealment, and willful copyright infringement. The jury assessed compensatory and punitive damages on May 6, 2003 at the damages phase in the aggregate amount of approximately $132 million.[1]

Now before the Court are the Defendants' post-trial motions for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b) and for a new trial and/or remittitur pursuant to Fed.R.Civ.P. 59. Also before the Court are TVT's motions for return, recall, and destruction of master recordings and infringing materials pursuant to § 503(b) of the Copyright Act of 1976 (the "Copyright Act"), 17 U.S.C. § 101 et seq., and for the setting of the date for accrual of prejudgment interest.[2] For the reasons

---

1. TVT elected to receive, with respect to the jury's finding of copyright infringement of "Get Tha Fortune," the statutory damages award determined by the jury as an alternative to actual damages, profits, and punitive damages on this claim.

 Additionally, as indicated in the main text, the liability phase of the trial of this matter occurred from March 10, 2003 through March 21, 2003, and the damages phase occurred from April 28, 2003 through May 6 2003. References to the trial record of the liability phase in the present Decision and Order appear as "Liability Tr.," and references to the damages phase appear as "Damages Tr."

2. TVT's motion for attorneys' fees will be addressed separately to allow for any appropriate consideration of resources expended in regards to the Defendants' post-trial motions.

discussed below, Defendants' motions for judgment as a matter of law are DENIED, Defendants' motions for a new trial are DENIED, TVT's motion for the return, recall, and destruction of infringing materials is GRANTED IN PART and DENIED IN PART, and TVT's motion for the setting of the date for accrual of interest is GRANTED. Defendants' motions for remittitur are addressed in a separate Decision and Order, issued as *TVT Records v. The Island Def Jam Music Group*, 279 F.Supp.2d 413, 2003 WL 22056308, No. 02 Civ 6644, slip op. (S.D.N.Y.2003), and accompanying this ruling.

## II. *FACTS* [3]

This case arises from a licensing dispute between TVT and its principal Steve Gottlieb ("Gottlieb") and IDJ concerning the distribution and exploitation of musical works created in significant part by Jeffrey Atkins, who is professionally known as Ja Rule ("Ja Rule"), and produced by Irving Lorenzo, who is professionally known as Irv Gotti ("Gotti," and together with Ja Rule, the "Artists"). Under an agreement dated March 2, 1998 between IDJ's predecessor-in-interest, Rush Associated Recordings, and Ja Rule, which was extended by an agreement dated August 16, 2003 between IDJ and Ja Rule, IDJ is entitled to Ja Rule's exclusive services as a recording artist. Pursuant to an agreement dated February 11, 1999 between IDJ's predecessor-in-interest, Island/Mercury Records, and Gotti, which was extended by an agreement dated December 17, 2001 between IDJ and Gotti, IDJ is entitled to Gotti's exclusive services as a record producer and talent-finder.

In an agreement entitled "Heads of Agreement Between Murderers Inc./Irv Gotti And Jeffrey Atkins (p/k/a 'Ja Rule') And Tee Vee Toons, Inc. ('TVT')" dated July 2, 2001 (the "Heads of Agreement"), TVT contracted with Ja Rule and Gotti— and Gotti's company, Murder Inc. ("Murder Inc.")—to record, produce, and exploit an album (the "CMC Album") featuring the performances of Ja Rule, Christopher Bristole, and Otha Miller (collectively the "CMC Artists").[4] Under the Heads of Agreement, four previously recorded CMC tracks would be reworked and supplemented with at least eight newly recorded tracks featuring the CMC Artists, including Ja Rule, to comprise the CMC Album. The Heads of Agreement, through various guarantees and indemnities, charges the Artists with securing any approvals, consents, and permissions necessary for them to satisfy their obligations under this contract.

The delivery date for the new recordings as contemplated by the written Heads of Agreement was November 1, 2001. This delivery date was later changed to reflect the schedules of the Artists and the timing of other contemplated album releases. TVT and the Artists ultimately agreed that the new tracks would be supplied to TVT in time for release in November 2002.

**3.** The factual recitation presented herein is intended to be a general summary of the jury's findings as reflected in its verdict, noting in the process some of the more salient evidence and events. It is of course not exhaustive of all the issues surrounding the parties' dispute or the evidence introduced at trial.

**4.** In 1994, Ja Rule, Bristole, and Miller performed together as a group known as Cash Money Click ("CMC") under contract with TVT. The group discontinued recording soon thereafter when Bristole was incarcerated. In 2001, after Bristole's release from prison, Ja Rule, motivated at least in part by a desire to assist Miller's and Bristole's career development, agreed to record a new album comprised of performances of these artists reunited again as CMC. Miller and Bristole had remained under contract with TVT.

In the interim, the Artists continued to work on the new recordings for the CMC Album, and by May 2002, approximately eleven new tracks had been recorded. During this time, TVT continued to pay the Artists' recording costs, the CMC Album and its fall 2002 release were publicized by both TVT and Gotti, as well as by IDJ's publishing affiliate, and TVT arranged and paid for a photo shoot for the Artists to further promote the CMC Album. Also during this interim time, Gotti's contract with IDJ was renegotiated in late 2001, and Ja Rule's contract with IDJ was renegotiated in early to mid-August of 2002.

TVT recognized that IDJ's assent to the project envisioned by the Heads of Agreement was necessary, and it accordingly endeavored to negotiate for IDJ's consent in mid-to-late 2001. In the process, Cohen and Gottlieb outlined a profit sharing arrangement. Gottlieb testified that in personal negotiations between them, Cohen gave his verbal approval to the terms and that Gottlieb understood that the parties had then concluded a binding agreement. In a letter dated October 22, 2001, William Leibowitz ("Leibowitz"), outside counsel for TVT, sent to IDJ, asking that they be signed and returned, execution copies of what TVT understood to be the written embodiment of an agreement, termed the Side Letter Agreement (the "Side Letter Agreement"), in which IDJ consented to permit its exclusive Artists to contribute to the CMC Album project. TVT's evidence indicates that IDJ representatives repeatedly assured Leibowitz that IDJ had consented to the CMC Album project and that executed copies of the Side Letter Agreement would be supplied. In a letter dated November 15, 2001, Leibowitz again asked IDJ to return executed copies of the Side Letter Agreement, indicating that TVT had relied on representations of consent and assurances that executed copies would be forthcoming.

In the spring of 2002, Leibowitz spoke with Brian Robinson of IDJ's legal department about the Side Letter Agreement and IDJ's prior assurances, and Robinson indicated that he would inquire into the matter and then contact Leibowitz with an update. Executed copies of the Side Letter Agreement were not returned to TVT. Instead, in a letter from Robinson to Leibowitz dated August 14, 2002, IDJ informed TVT that IDJ was rejecting the agreement embodied in the Side Letter Agreement. The evidence at trial also indicates that the execution copies of the Side Letter Agreement had actually been signed by Jeffrey Kempler ("Kempler"), IDJ's senior vice president of business and legal affairs, sometime in late 2001 and had been stored at IDJ's offices. The evidence further indicates that sometime in early to mid-August 2002, at or around the time IDJ's rejection letter was sent to TVT, Kempler crossed out his signature on this document.

In or around June 2002, TVT granted IDJ's request for a license to use a musical composition and a TVT sound recording entitled "Get Tha Fortune" in a digital video disc entitled "Irv Gotti Presents: The Inc." (the "DVD") which IDJ marketed and distributed. TVT indicates that it relied on representations that IDJ had consented to the CMC Album project, believing the publicity from the DVD would benefit the market performance of the CMC Album contemplated for release later that year. TVT granted IDJ permission to utilize this material prior to IDJ's written rejection or renunciation of the Side Letter Agreement. On this same theory, Gottlieb also granted Gotti permission to use one of the CMC Album songs delivered in rough form to TVT, called

"The Rain," on the "Irv Gotti Presents: The Inc." compact disc (the "CD").

On March 7, 2003, the Friday before the Monday that trial of this matter was scheduled to commence, IDJ delivered to TVT a letter and accompanying documents indicating that by this means IDJ had formally agreed to the Side Letter Agreement and consented to the CMC Album project. This delivery was preceded by two related events: an oral waiver of IDJ's exclusivity rights to the Artists' services expressed by Cohen during his deposition on March 5, 2003, two days earlier; and a February 26, 2003 delivery of a putative CMC Album materials represented to be in final form.[5] A similar delivery of a purportedly finished CMC Album was made to Gottlieb's apartment on April 25, 2003, the Friday before the Monday on which the damages phase of the trial of this action commenced. Evidence at trial indicates that none of these materials could be properly characterized as constituting a CMC Album in final form accepted by TVT.

## III. DISCUSSION

### A. STANDARDS OF REVIEW

██ The moving party bears a heavy burden to prevail on a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b). Such an application is appropriately granted where "there is no legally sufficient evidentiary basis for a reasonable jury to find for a party." *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 120 (2d Cir.1998). The Court may not arrive at this determination by evaluating the credibility of witnesses or the relative weight of the evidence. Rather, in assessing a motion for judgment under Rule 50, the Court must view the evidence in the light most favorable to the non-movant. *See Caruolo v. John Crane, Inc.*, 226 F.3d 46, 51 (2d Cir.2000). To grant a Rule 50(b) application, there must be "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of mere surmise and conjecture, or ... such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against [it]." *Concerned Area Residents for the Environment v. Southview Farm*, 34 F.3d 114, 117 (2d Cir.1994) (quoting *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1046 (2d Cir.1992) (citations omitted)). Moreover, arguments not raised in a preceding Rule 50(a) application are not properly preserved for review in a subsequent Rule 50(b) motion. *See Holmes v. United States*, 85 F.3d 956, 963 (2d Cir.1996) ("The issue was not mentioned in the ... Rule 50(a) motion.... We therefore have no occasion to rule on this ... claim."); *Cruz v. Local Union No. 3*, 34 F.3d 1148, 1155 (2d Cir.1994) ("If an issue is not raised in a previous motion for a directed verdict, a Rule 50(b) motion should not be granted unless it is required to prevent manifest injustice." (citations omitted; internal quotations omitted)).

██ The standard for granting a Rule 59 motion is less stringent. First, the trial judge may weigh the evidence himself and need not view it in the light most favorable to the non-movant and, second, the motion may be granted even if substantial evidence may support the jury's verdict. *See DLC Mgmt. Corp. v. Town of Hyde Park*,

---

**5.** For the reasons explained in the Court's Decision and Order dated March 21, 2003, *TVT Records v. The Island Def Jam Music Group*, 254 F.Supp.2d 322 (S.D.N.Y.2003), these eve-of-trial developments led the Court to bifurcate the proceedings into separate liability and damages phases. *See also TVT Records v. The Island Def Jam Music Group*, 257 F.Supp.2d 737, 739–42 (S.D.N.Y.2003).

163 F.3d 124, 134 (2d Cir.1998); *Sharkey v. Lasmo (Aul Ltd.),* 55 F.Supp.2d 279, 283 (S.D.N.Y.1999), *aff'd,* 214 F.3d 371 (2d Cir. 2000). The Court may grant a new trial "if it is convinced that the jury had reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Song,* 957 F.2d at 1047 (citations omitted; internal quotations omitted); *accord Katara v. D.E. Jones Commodities,* 835 F.2d 966, 970 (2d Cir.1987). While the Court may grant a new trial even where substantial evidence supports the jury's verdict, the Second Circuit has cautioned that "the jury is empowered and capable of evaluating a witness's credibility, and this evaluation should rarely be disturbed." *Dunlap–McCuller v. Riese Org.,* 980 F.2d 153, 158 (2d Cir.1992).

■ Moreover, absent plain error, the Court will not review issues set forth as bases for a new trial pursuant to Rule 59 for which no timely objection was raised at trial. *See, e.g.,* Fed.R.Evid. 103; *Schaafsma v. Morin Vermont Corp.,* 802 F.2d 629, 636 (2d Cir.1986) ("Unless this was plain error, plaintiffs' failure to object to the [issues now raised] on this ground precludes our review.... Moreover, the purpose of the contemporaneous objection rule ... is to alert the trial judge to his error so that he can correct it ...."); *Palmieri v. Celebrity Cruise Lines, Inc.,* No. 98 Civ.2037 LAP HBP, 2000 WL 310341, at * 4 (S.D.N.Y. Mar. 27, 2000) ("A principle that strikes very deep is that a new trial will not be granted on grounds not called to the court's attention during the trial unless the error was so fundamental that gross injustice would result." (citations omitted; internal quotations omitted)); *see also Memorial Drive Consultants, Inc. v. ONY, Inc.,* No. 96 Civ. 0702E(F), 2001 WL 241781, at *6 (W.D.N.Y. Mar. 7, 2001) ("Pursuant to Rule 103 of the Federal Rules of Evidence,

the party seeking a new trial must have made a timely objection or offer of proof to preserve the evidentiary issue for review."); *Hardy v. Saliva Diagnostic Sys., Inc.,* 52 F.Supp.2d 333, 340 (D.Conn. Mar.17, 1999) ("The burden of showing the harmful error rests with the moving party ..., and unless there is 'plain error,' failure to object to an issue during trial precludes review of that issue on a motion for a new trial." (citations omitted)).

## B. DEFENDANTS' RULE 50(b) MOTIONS

Defendants set forth numerous claims in support of their motions for judgment as a matter of law pursuant to Rule 50(b). The Court will address each in turn.

### 1. Tortious Interference With Contractual Relations: Parties to the Heads of Agreement and Economic Justification

Defendants argue that TVT's claim of tortious interference with contractual relations must be dismissed, and that the jury's verdict accordingly must be set aside, because the Defendants are parties to the contract that was interfered with, namely, the Heads of Agreement. Defendants posit two arguments in support of their claim that they were parties to the Heads of Agreement: that IDJ was a party because Murder, Inc., a party to the Heads of Agreement, was founded as a joint venture between Gotti and IDJ; and that IDJ was a party to the Side Letter Agreement which was incorporated into the Heads of Agreement. Defendants also assert a defense of economic justification. The latter two arguments were raised by Defendants in their motion for summary judgment. The Court fully considered and ultimately rejected those arguments in a Decision and Oder dated February 13, 2003, *see TVT Records v. The Island Def*

*Jam Music Group*, 244 F.Supp.2d 263, 273–75 (S.D.N.Y.2003); *see also TVT Records v. The Island Def Jam Music Group*, No. 02 Civ. 6644 (VM), 2003 WL 1858151, at *4 (S.D.N.Y. Apr. 9, 2003) (same arguments presented and rejected in context of Defendants' motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(a) following liability phase), and for the reasons stated therein, these arguments remain unpersuasive as recast in the present context.

■ The Court is also unpersuaded by Defendant's remaining argument, namely, that by virtue of IDJ's joint venture relationship with Murder Inc., which was a party to the Heads of Agreement, they, too, were parties to that agreement.[6] Prior to the commencement of the trial of this matter, the Defendants submitted to the Court various motions *in limine*. One of those motions concerned the admissibility of certain statements by Gotti, the principal of Murder Inc. TVT claimed that Gotti's statements were those of a party opponent in that the relationship between Murder Inc. and IDJ effectively rendered Gotti an agent of that defendant. In response, IDJ and Cohen argued as follows:

> Gotti's alleged statements are not admissible against IDJ for the simple reason that they cannot be attributed to IDJ. IDJ and Gotti are joint venture partners, but the statements at issue do not concern that business. Rather, they concern *a business project separate from the IDJ/Gotti joint venture*. Under the Limited Liability Company Agreement, dated December 17, 2001, which establishes the joint venture between IDJ and Gotti (the "Joint Venture Agreement"), Gotti is to serve as talent finder and producer to IDJ on an exclusive basis. To the extent that Gotti had any discussions with Mr. Leach or Mr. Gottlieb regarding an agreement to provide these very services to TVT, his actions were in conflict with the express terms of the Joint Venture Agreement, and thus could not, by definition, have been made within the scope of the joint venture. As such, Gotti's alleged statements cannot be attributed to IDJ as an admission of a party-opponent.

(Memorandum Of Law In Support Of Defendants–Counterclaimant's Motion *In Limine* To Preclude TVT From Introducing Hearsay Statements Of Irv Gotti dated February 28, 2003 at 4 (emphasis added).) By Defendants' own characterization, then, Gotti's and Murder Inc.'s participation in the CMC Album project with TVT lay outside the scope of the joint venture agreement between Gotti and IDJ. In fact, repeatedly and emphatically throughout the liability phase of the trial, Defendants insisted that Gotti's statements and actions concerning the CMC Album project were made solely on behalf of Murder Inc. and could not be attributed to IDJ under agency principles. Based on these representa-

---

**6.** IDJ and Gotti each enjoyed a fifty percent stake in the joint venture. (See The Limited Liability Company Agreement of M.I. Records, LLC dated December 17, 2001, § 30.1 (attached as Ex. E to Declaration of David A. Picon dated February 28, 2003 (the "Murder Inc. Joint Venture Agreement")).) Cohen, the chairman of IDJ, was designated to serve on the Murder Inc. management board "as IDJ's representative." *Id.*, § 7.01(a).) The Murder, Inc. Joint Venture Agreement further provides that "IDJ may replace IDJ's designated repre-

sentative . . . or revoke its appointment of any previously designated IDJ representative at any time and from time to time by giving written notice . . . ." Accordingly, Cohen's relationship to Murder Inc. is entirely derivative of that of IDJ. Furthermore, testimony at trial indicates that Cohen was not even aware of his board member status, suggesting a formalistic quality to this role, which, in turn, further subordinates any such relationship. (Liability Tr. at 1020.)

tions of Gotti's relationship to IDJ and the materials then on the record, the Court so ruled. (*See* Liability Tr. at 1014–18 (argument by the parties and Court's ruling that "I cannot say as a matter of law that Mr. Gotti was an agent . . . ."))

Consequently, to the extent Defendants accurately characterized Gotti's and Murder, Inc.'s involvement in the Heads of Agreement as a "business project separate from the IDJ/Gotti joint venture," they cannot now invoke that very joint venture agreement as a basis to assert themselves as parties to the Heads of Agreement.

Also, in their Rule 50(a) motions, neither Defendant raised the argument that IDJ was a party to the Heads of Agreement by virtue of Murder Inc.'s involvement. Therefore, the argument must be dismissed on this basis as well. *See Holmes,* 85 F.3d at 963; *Cruz,* 34 F.3d at 1155.[7]

### 2. *Tortious Interference With Contractual Relations: Scope of Cohen's Employment*

■ Cohen raises an additional argument in support of his motion for judg-

---

**7.** Defendants argue that any failure on their part to raise arguments in their Rule 50(a) motions should be excused because the Court "truncated" their oral application during the trial. (IDJ's Reply Memorandum Of Law In Support Of Its Motion For Judgment As A Matter Of Law Pursuant To Fed.R.Civ.P. 50(b) dated August 1, 2003 at 3.) The Court disagrees with this characterization, noting that, at most, it merely indicated a preference for expediency. Beginning with the damages phase, the Court first notes that it asked at the outset how much time IDJ's counsel would require for his presentation, which was made primarily on behalf of IDJ but also for Cohen, (*see, e.g.,* Damages Tr. at 1116 ("There's no punitive damages that should be awarded against Mr. Cohen because . . . .").) (Damages Tr. at 1111.) More than the designated time was provided, and what the Court, after the designated time period had lapsed, indicated was that counsel should "wrap up." (Damages Tr. at 1118.) The Court did permit subsequent comment afterwards. (Damages Tr. at 1121–22.) Second, the Court received a written Rule 50(a) application from Cohen's counsel, in which IDJ joined. (Damages Tr. at 1118–19.) Third, there is no reason for IDJ to believe that it could not submit its own written motion like the one submitted by Cohen, in which IDJ joined, if IDJ felt that additional argument were necessary.

Similarly, during the liability phase, the Court never "truncated" Defendants' counsel's presentation in support of their motion under Rule 50(a). Rather, the Court ended counsel's *reply* presentation following TVT's response to Defendants' initial presentation, and the Court did so because counsel's reply arguments had become largely repetitive of its initial presentation. (Liability Tr. at 1625–26.) Indeed, with respect to the initial presentation by Defendants' counsel, the following exchange occurred at the outset addressing counsel's time demands:

> Defendants' Counsel: . . . We move to dismiss under Rule 50 on the following grounds. First let us take the breach of contract claim which I believe is Count 2.
>
> TVT's Counsel: If this is going to be lengthy, would it make sense to go into chambers, your Honor?
>
> The Court: Are you gong to go into details of what your claims are?
>
> Defendants' Counsel: Not too much. Let me try it this way, and if your Honor feels we should move, we'll move.

(Liability Tr. at 1609.) Defendants' counsel then proceeded with his argument. Nothing in this exchange indicates any basis to infer that the Court "truncated" the opportunity for argument. While the Court, shortly thereafter, declared a ten minute break for the jury, (Liability Tr. at 1610), there is no indication that the anticipated time frame in any way was a limitation on the argument, as opposed to an estimation, particularly in light of the fact that virtually all mid-morning or mid-afternoon breaks through that point (and also thereafter) were announced as ten minutes in length and that these breaks had tended to last considerably longer. Indeed, Defendants' counsel was allowed to argue and conclude his presentation without any further comment from the Court. (Liability Tr. at 1611–19.) For all of these reasons, the Court rejects Defendants' argument that any failures to raise arguments for judgment as a matter of law under Rule 50(a) should be excused.

ment as a matter of law as regards TVT's claim of tortious interference with contractual relations against him. Cohen relies on *Petkanas v. Kooyman*, 303 A.D.2d 303, 759 N.Y.S.2d 1 (2003), to argue that the jury's verdict must be set aside because TVT failed to prove that Cohen acted beyond the scope of his employment and with the intent to harm TVT's business for his own personal gain. Initially, the Court notes that Cohen raised this argument for the first time in his Rule 50(a) motion presented during the damages phase of this litigation. As the matter at hand relates to the sufficiency of the evidence concerning liability and not damages, the matter was improperly raised during the damages phase and instead should have been raised as part of his Rule 50(a) motion presented during the liability phase. As grounds for judgment as a matter of law under Rule 50(b) must have been properly asserted pursuant to a motion under Rule 50(a), this argument must be dismissed on this basis. *See Holmes*, 85 F.3d at 963; *Cruz*, 34 F.3d at 1155. Nonetheless, the Court will address the argument here and identify an independent basis to reject the claim, noting that it fails not on the evidence but on the law.

The requirements of activity beyond the scope of employment, malice, and personal gain invoked by Cohen are referenced out of context. That heightened standard applies when a corporate officer is accused of tortiously interfering with, or inducing the breach of, a contract between that officer's employer corporation and a third party. *See, e.g., Maillet v. Frontpoint Partners, L.L.C.*, No. 02 Civ. 7865(GBD), 2003 WL 21355218, at *2 (S.D.N.Y. June 10, 2003) ("Under ... New York law, officers and directors are only liable for interfering with their *own company's contracts* if they exceed the scope of their authority." (emphasis added)); *The High View Fund, L.P. v. Hall*, 27 F.Supp.2d 420, 429–30 (S.D.N.Y.1998) (holding that a director of a corporation "may be held liable for tortious interference *with the corporation's contracts* if she exceeds the scope of her corporate authority in causing the breach of those contracts." (emphasis added)); *Petkanas*, 303 A.D.2d 303, 759 N.Y.S.2d at 2 ("[A] cause of action seeking to hold corporate officials personally responsible *for the corporation's breach* of contract is governed by an enhanced pleading standard." (citation omitted; emphasis added; internal quotations omitted)); *Hoag v. Chancellor, Inc.*, 246 A.D.2d 224, 677 N.Y.S.2d 531, 534 (1998) ("To establish a corporate officer's liability for inducing a breach of a contract *between the corporation and a third party*, the complaint must allege that the officers' ... acts were taken outside the scope of their employment or that they personally profited from their acts." (citations omitted; emphasis added; internal quotations omitted)).

The theory underlying this special treatment of corporate officials derives from the principle that one cannot be liable for interfering with one's own contract. *See, e.g., Tejidos Chardin, S.A. v. Turkie*, No. 97 Civ. 4643(JSM), 1998 WL 886986, at *1 (S.D.N.Y. Dec.18, 1998) ("Where the corporate officer/director is acting within the scope of his or her authority, the officer/director is not a third party vis-a-vis the corporation and as such can not interfere with its own contract."); *Solow v. Stone*, 994 F.Supp. 173, 181 (S.D.N.Y.1998) ("A corporation's officer or director generally cannot be held liable under a theory of tortious interference for causing the corporation to breach a contract.... [This principle is] consistent with the principle that a defendant cannot tortiously interfere with a contract if he is not a third party unrelated to the contract." (citations omitted; internal quotations omitted)).

Outside of that particular situation—that is, where, as here, the corporate official's employer company is not a party to the

affected contract—the Second Circuit has held that "a corporate officer who controls corporate conduct and thus is an active individual participant in that conduct is liable for the torts of the corporation." *State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1052 (2d Cir.1985). Likewise, this Court has previously held that "New York law provides that a corporate officer who participates in the commission of a tort, even if he acts on behalf of the corporation and in the course of his corporate duties, may ordinarily be held individually responsible." *Davidcraft Corp. v. Danu Int'l, Inc.*, No. 90 Civ. 6578(CMM), 1992 WL 162997, at *6 (S.D.N.Y. June 24, 1992); *Nat'l Survival Game v. Skirmish, USA Inc.*, 603 F.Supp. 339, 341 (S.D.N.Y. 1985) (same).

The contract that is the subject of TVT's tortious interference claim is the Heads of Agreement. Indeed, while TVT asserted a breach of contract claim against IDJ for breaching the Side Letter Agreement, no corresponding claim was asserted against Cohen, presumably in recognition of this line of authority. Because, for reasons previously indicated, IDJ was not a party to the Heads of Agreement, the heightened showing of malice, personal gain, and activity beyond the scope of employment are inapposite, and Cohen's argument on this basis is without merit.[8]

3. *Fraud By Fraudulent Concealment: Duplicative of Breach of Contract and the Defendants' Duty To Disclose*

Defendants next argue that the jury's verdict of liability for fraud by fraudulent concealment is unsustainable as a matter of law because the Defendants' failure to disclose an intent not to perform is duplicative of TVT's breach of contract claim. This Court previously addressed these arguments, raised pursuant to the Defendants' motion for summary judgment, concluding that the contentions lacked merit. *See TVT Records,* 244 F.Supp.2d at 275–77. For the reasons stated therein, the Defendants' arguments are again rejected.

■ Defendants also argue that they had no duty to disclose their intent not to perform because no fiduciary relationship existed between them and TVT. This argument must be dismissed as it was not raised pursuant to the Defendants' Rule 50(a) motion made during the liability phase of the trial of this matter. *See Holmes,* 85 F.3d at 963; *Cruz,* 34 F.3d at 1155. The argument, more substantively, represents a selective, and thus unpersuasive, reading of the law. It is well settled that New York law imposes a duty to disclose for purposes of fraudulent concealment liability not only in cases involving a fiduciary or confidential relationship, which Defendants indicate, but also when (1) a party makes a partial or ambiguous statement that requires clarification, and when (2) one party has superior knowledge of certain information that is not readily available to the other party and the first party knows that the second party is acting on the basis of mistaken knowledge. *See Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank,* 57

---

**8.** Cohen also cites language in *Petkanas* to argue that a similar heightened showing is required to support the jury's punitive damages award against him. Not only does *Petkanas* not apply to the facts of the case at bar for the reasons discussed in the main text, but, furthermore, the dispute in *Petkanas* did not concern punitive damages. Instead, the State court addressed the pleading requirements of a claim of tortious interference with contract asserted against members of a company's board of directors. Therefore, Cohen's reliance in this case to challenge the jury's award of punitive damages against him is similarly misplaced.

F.3d 146, 155 (2d Cir.1995); *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150, 151–52 (2d Cir.1993).

■ The relevant superior knowledge possessed by Defendants is reflected in the jury's verdict of liability for breach of contract, fraud by fraudulent concealment, and copyright infringement (insofar as the license defense was rejected). It includes their intent not to perform in accordance with their representations to TVT—that is, their undisclosed intent not to permit the Artists to participate in the CMC Album project—coupled with their desire to placate the Artists, who had expressed interest in the CMC Album project, pending their contract re-negotiations with IDJ. Furthermore, with respect to partial disclosures and ambiguous statements, Cohen himself testified that he was "unclear" to TVT about IDJ's position as regards its assent to the CMC Album,[9] and, similarly, Kempler admitted that in the face of the parties' representations and profit sharing and logistical negotiations concerning the CMC Album project, no one at IDJ responded to Leibowitz's November 15, 2001 letter to IDJ on behalf of TVT indicating that TVT was relying on verbal assurances of IDJ's consent to the CMC Album project, (Liability Tr. at 301–305). Defendants' argument for judgment as a matter of law with respect to the jury's finding of liability against them for fraud by fraudulent concealment, based on their claim that they were not bound by any duty to disclose, must therefore be rejected on this basis as well.

### 4. Copyright Infringement; Validity of the Licenses and Knowledge of Ownership

Defendants argue that the evidence is insufficient to support the jury's finding of liability for copyright infringement because the protected works in question were used pursuant to what the Defendants, even now, claim to be valid licenses. This proposition was squarely rejected by the jury's verdict of liability for copyright infringement as against both Defendants, thus sustaining TVT's argument that the licenses were procured by fraud and therefore invalid. (Jury Verdict Sheet at 4–6.)[10] Cohen further argues that the evidence was insufficient to support the jury's finding of direct, contributory, or vicarious copyright infringement or that any such infringement was willful. The Court has already addressed these matters at least twice elsewhere. *See TVT Records,* 244 F.Supp.2d at 269–72 (summary judgment motion); *TVT Records,* 2003 WL 1858151, at *5–*6 (Rule 50(a) motion following liability phase). For the reasons there indicated, the Court finds that the evidence is sufficient to sustain the jury's findings of liability for willful copyright infringement by IDJ and for willful direct, contributory, and vicarious copyright infringement by Cohen.

Defendants do raise a new challenge to their liability for willful copyright infringe-

---

**9.** *See, e.g.,* Liability Tr. at 1089–92 (Q: "And did you tell Mr. Gottlieb at that time words to the effect of, IDJ would not waive its exclusivity rights and you would not permit Irv Gotti or Ja Rule to work on the CMC album, correct? ... A: No."); (Damages Tr. at 303–306, 309–310 ("I would have been absolutely emphatic in my position and not been wishy-washy.... I'm upset at myself for not giving a clear and absolutely emphatic answer of my instructions from day one, whether I should have just gone along with Irv and allowed this to happen or said no.")).

**10.** The jury also found both Defendants liable for fraud by fraudulent concealment. (Jury Verdict Sheet at 3.) The Defendants' challenge to the sufficiency of the evidence underlying this aspect of the jury's verdict is addressed in the preceeding section and rejected for the reasons there discussed.

ment. Both claim that they did not have knowledge of TVT's ownership in "The Rain," and Cohen further claims he did not know "Get Tha Fortune" appeared on the "Irv Gotti Presents: The Inc." DVD.[11] At the outset, the Court notes that these arguments were not raised in Defendants' motions pursuant to Rule 50(a) and must be dismissed on this basis. *See Holmes,* 85 F.3d at 963; *Cruz,* 34 F.3d at 1155.

▮ Even on the merits, though, the arguments are unpersuasive. The law does not require knowledge to establish copying for purposes of copyright infringement. Rather, the law recognizes that "[i]t is generally not possible to establish copying as a factual matter by direct evidence, as it is rare that the plaintiff has available a witness to the physical act of copying.... Therefore, copying is ordinarily established indirectly by the plaintiff's proof of access and substantial similarity." *Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 115 (2d Cir.1998) (internal quotations omitted) (quoting 4 Melville Nimmer and David Nimmer, *Nimmer on Copyright* § 13.01[B] (1998)); *see, e.g., Boisson v. Banian, Ltd.,* 273 F.3d 262, 267–68 (2d Cir.2001); *Williams v. Crichton,* 84 F.3d 581, 587 (2d Cir.1996). With respect to "The Rain," similarity is not an issue in dispute, as the very song intended for the CMC Album was itself used, instead, on the "Irv Gotti Presents: The Inc." CD.

Regarding access, this element "may be established directly or inferred from the fact that ... a party had a reasonable possibility of viewing the prior work." *Boisson,* 273 F.3d at 270 (citing Nimmer, *supra* § 13.02[A] ). The record contains sufficient evidence to support an inference of access. The evidence indicates that IDJ and Gotti were equal partners in the Murder Inc. venture and that Murder Inc. and IDJ had offices on successive floors in the same building and worked together on numerous album releases including the "Irv Gotti Presents: The Inc." CD and DVD. Because Gotti and Cohen, and Murder Inc. and IDJ collaborated regularly in the promotion, content screening, copyright clearance, and marketing strategy for these and other Murder Inc. releases, as the evidence indicates, Defendants clearly had sufficient access to "The Rain" to defeat Defendants' present challenge to the jury's verdict of liability against them.[12] (*See, e.g.,* Liability Tr. at 503–504, 1059, 1107–1110.)

Similarly, whether Cohen did or did not know about the inclusion of "Get Tha Fortune" on the "Irv Gotti Presents: The Inc." DVD, which was marketed and distributed by IDJ, is a credibility matter that the jury apparently resolved against Cohen based on evidence such as that discussed above detailing the extent of Cohen's interactions with Gotti and Murder Inc. The Court finds no basis to disturb such a finding. Finally, to the extent that Defendants raise this issue of knowledge as regards not liability but willfulness, the Court, as mentioned, has already addressed the basis for this jury finding and has found the evidence sufficient to sustain it. *See TVT Records,* 244 F.Supp.2d at 269–72; *TVT Records,* 2003 WL 1858151, at *5–6.

---

**11.** IDJ sought and obtained a written clearance from TVT to use "Get Tha Fortune" on this release, presumably foreclosing a corresponding claim of lack of knowledge by IDJ.

**12.** For these reasons, Defendants' argument in support of their motion for a new trial that the weight of the evidence counsels against a finding that IDJ knew about TVT's copyright interest in "The Rain" is rejected as inapposite.

5. *Standing of TVT Music, Inc.*

Defendants also argue that TVT Music, Inc. has no standing to assert claims for breach of contract, tortious interference with contractual relations, or fraud against Defendants in this litigation because it was not a party to nor a third party beneficiary of the Heads of Agreement. Defendants also seek a new trial on this basis as to the assertion of these claims by TVT Records, should the Court agree that TVT Music, Inc. lacks standing, because there would be no way to allocate the jury's award between the two plaintiffs and reduce it to reflect any such lack of standing by TVT Music, Inc.

 Under New York law, a third party to a contract is considered an intended third party beneficiary where that party's "right to performance is appropriate to effectuate the intention of the parties to the contract *and* either the performance will satisfy a money debt obligation of the promisee to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." *Vista Co. v. Columbia Pictures Industries, Inc.*, 725 F.Supp. 1286, 1296 (S.D.N.Y.1989) (citation omitted; emphasis in original; internal quotations omitted); *Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 573 (2d Cir.1991); *see Septembertide Publ'g, B.V. v. Stein and Day, Inc.*, 884 F.2d 675, 679 (2d Cir.1989); Restatement (Second) of Contracts § 302 (1981). In addition to the agreement itself, the Court looks to the surrounding circumstances in making this determination, as third party beneficiaries need not be named in the agreement at issue. *See Trans–Orient Marine Corp.*, 925 F.2d at 573; *Septembertide Publ'g.*, 884 F.2d at 679; *Vista Co.*, 725 F.Supp. at 1296.

 TVT Music, Inc. is a wholly owned subsidiary of Tee Vee Toons, Inc., which does business as TVT Records. TVT Records and TVT Music, Inc. are the named plaintiffs in this action. TVT Music, Inc. is the publishing arm of Tee Vee Toons, Inc. and its business enterprise. (Liability Tr. at 1457.) While TVT Music, Inc. was not a designated signatory to the Heads of Agreement, Tee Vee Toons, Inc., its parent company, was a designated signatory party. The breakdown of revenues that would flow from the Heads of Agreement, had the CMC Album actually been produced and marketed, in reflection of TVT's business enterprise allotting publishing responsibility to TVT Music, Inc. is governed by the corporate structure and business relationship between those entities, and its precise terms are immaterial. What matters is that TVT Music, Inc. would have received from Tee Vee Toons, Inc.—a promisee of and party to the heads of Agreement—a benefit in the form of music publishing revenues for such services furnished to Tee Vee Toons, Inc. in connection with the CMC Album. Furthermore, Defendants, given their knowledge of the industry and, more specifically, of IDJ's own place within a larger corporate structure with generally similar allocations of publishing responsibilities to specific affiliates,[13] knew or should have known that some such benefit would run to TVT Music, Inc. Therefore, TVT Music, Inc.'s right to performance—namely, to receive the music publishing benefits directed to it by Tee Vee Toons, Inc., a designated signatory party—is appropriate to effectuate this allocation of responsibility within TVT's

---

13. The record indicates that IDJ is a corporate subsidiary of UMG Recordings, Inc. which, like Tee Vee Toons, Inc., has separate affiliates responsible for music publishing. (*See, e.g.,* Liability Tr. at 1065 (testimony by Cohen that "Universal Music Group owns it. . . . owns Universal Music Publishing.").)

business enterprise and corporate structures, and is reasonable in light of IDJ's constructive, if not actual, knowledge of the same. Accordingly, the Defendants' challenge to the standing of TVT Music, Inc. to assert breach of contract, tortious interference with contractual relations, and fraud against them is rejected, as is their request for a new trial on this basis.

### 6. *Punitive Damages: Existence of Malice and a Public Aim*

Defendants challenge the sufficiency of the evidence to support the jury's award of punitive damages, in connection with its finding of liability for breach of contract and fraud, on the grounds that the evidence was insufficient to establish malice or gross, wanton, or willful conduct and the existence of a public aim. They also challenge the sufficiency of the jury's punitive damages award in connection with its finding of liability against Defendants for tortious interference with contractual relations on the ground that the evidence was insufficient to demonstrate the requisite malice or gross, wanton, or willful conduct. These arguments have been exhaustively addressed and rejected by this Court pursuant to the Defendants' motions for judgment as a matter of law under Rule 50(a) made during the damages phase of the trial of this matter. *See TVT Records v. The Island Def Jam Music Group*, 262 F.Supp.2d 188, 191–98 (S.D.N.Y.2003). The Court reiterates its findings there expressed and sees no reason to revisit its prior determinations.[14]

### 7. *Double Recovery*

Cohen raises a general challenge to the jury's awards of compensatory damages pursuant to TVT's claims under New York law as reflecting an impermissible double recovery for harm TVT sustained. The Court rejects this global challenge to the jury's awards because the Court's jury charge clearly and carefully instructed the jurors on the importance of avoiding such a double recovery and on how to reduce any awards they imposed to ensure that TVT recovers only once for any harm or component of harm it sustained. (Damages Tr. at 1285–86.) The Court neither sees nor has been presented with any basis to presume the jury ignored these instructions.

In this vein, the Court notes a curious argument posed by Cohen challenging the compensatory damages award. Cohen claims that loss of goodwill as a component of compensatory damages for tortious interference with contractual relations is inherently temporary because any loss of goodwill resulting from TVT's inability to release the CMC Album would be alleviated once the album were to be released. Therefore, according to Cohen, awarding TVT lost profits together with the value of this harm to its goodwill is duplicative. (Defendant Lyor Cohen's Memorandum Of Law In Support Of His Motions For Judgment As A Matter Of Law, New Trial

---

**14.** Defendants also dispute the jury's award of punitive damages pursuant to its findings of liability for copyright infringement of "Get Tha Fortune," asserting that punitive damages are unavailable in copyright infringement cases. The Court articulated its concerns regarding the uncertainty of the law in this matter and its conclusions about the availability of punitive damages for copyright infringement claims during one of the numerous conference addressing the contents of the Court's jury charge. *See TVT Records v. The Island Def Jam Music Group*, No. 02 Civ. 6644 (VM), 262 F.Supp.2d 185, 2003 WL 21047726 (S.D.N.Y. May 7, 2003). Nonetheless, because TVT has elected to receive statutory damages in lieu of compensatory and punitive damages on this claim, the jury's punitive damages awards do not constitute any portion of the Judgment entered by the Court in this case. Therefore, the Court need not address this challenge in this context.

And/Or Remittitur (undated) ("Cohen Br.") at 24.) Irrespective of the accuracy of such speculation, it is not lost on the Court that the CMC Album, the one at the core of this very litigation, has not been released, nor is there any indication that it can or will be released. Therefore, Cohen's argument on this basis is meritless.[15]

### 8. *Loss of Goodwill*

IDJ challenges the sufficiency of the evidence underlying the jury's award of damages for harm to TVT's goodwill pursuant to its verdict of liability against IDJ for breach of contract and against both Defendants for tortious interference with contractual relations on various grounds, some old and others new. The Court will address these matters in turn.

■ In response to the portion of Defendants' motion pursuant to Rule 50(a) set forth during the damages phase of the trial of this matter challenging the sufficiency of the evidence of loss of goodwill, this Court identified the potential audience for TVT's goodwill to include album purchasers as well as artists and other business entities doing business with TVT. The Court also there identified the following grounds upon which the jury, on the basis of this record, could infer loss of goodwill: advertisements promoting the anticipated CMC Album and "setting up" the marketplace for its release, which never occurred; the loss of TVT's credit line resulting from the disruption in cash flow as a consequence, at least in part, of TVT's inability to exploit the CMC Album as anticipated; loss of or damage to TVT's business relationship with Gotti, a highly successful producer able to furnish services of artists like Ja Rule; and, more generally, the harm to TVT's reputation in the industry resulting from its inability to follow

through with representations of a forthcoming CMC Album release that may affect not only the confidence of its existing artists—should, for example, contract renegotiations become necessary, as was the case between IDJ and Gotti and Ja Rule—but also that of prospective artists. *See TVT Records,* 262 F.Supp.2d at 190–91.

As regards Gotti and Ja Rule, IDJ raises the argument that these individuals' exclusive services contracts with IDJ render their attitudes concerning TVT's goodwill inapposite since any business dealings between them and TVT would require IDJ's consent. First, this argument was not raised in either of the Defendants' Rule 50(a) motions and must be dismissed on that basis. *See Holmes,* 85 F.3d at 963; *Cruz,* 34 F.3d at 1155. More substantively, furthermore, the argument overlooks the possibility that these Artists might, as the record suggests was the case here, want to deal with TVT and convince IDJ to allow them to do so. It also overlooks the fact that employment contracts may at some point terminate. These Artists' contracts with IDJ do not compel the result Defendants propose. Therefore, IDJ's argument must be rejected for these reasons as well.

In challenging the sufficiency of the evidence in support of the jury's award of damages to TVT for harm to its goodwill, IDJ also argues that TVT cannot have suffered such harm because its projected sales revenues for the year 2003 had increased as compared to those for the year 2002. The Court must review the record in a light most favorable to sustaining the jury's verdict, and, while an increase in revenue may weigh against concluding that TVT's goodwill was harmed, it does not compel this result. The Court has sus-

---

**15.** For the reasons indicated in Sections II.B.(8) and II.B.(9) *infra,* the evidence is suffi-cient to support the independent awards of lost profits and harm to goodwill.

tained the sufficiency of the evidence underlying the jury's award of damages for loss of goodwill for the reasons summarized above. *See TVT Records,* 262 F.Supp.2d at 190–91. That evidence can reasonably outweigh the evidence of TVT's revenues that IDJ references because, as a practical matter, examining a company's revenues without similarly examining its expenses and other commitments is an incomplete understanding of that company's financial status. Moreover, financial stability, while relevant to one of the identified bases for concluding that TVT's goodwill was harmed, namely, the loss of TVT's credit line, is not necessarily relevant to the other kinds of harm that can reasonably be said to have impacted TVT's goodwill, specifically here, its business reputation and ability to keep its current artists and attract new ones. It is not the Court's role to weigh the evidence itself but, rather, merely to determine whether a sufficient basis exists in the record to reasonably support whatever factual outcome was reached by the jury. *See Nadel v. Isaksson,* 321 F.3d 266, 272 (2d Cir.2003).

IDJ also identifies various potential kinds of harm in the nature of loss of goodwill—e.g., dissatisfaction by retailers or album purchasers—that TVT did not introduce at trial. The failure to establish loss of goodwill on one basis does not foreclose the sufficiency of TVT's showing on other grounds. In this regard, to the extent IDJ also may appear to argue that the applicable audience regarding loss of goodwill by TVT is confined to album purchasers based on the Court's use of the word, "customer," in its jury charge on the matter, the Court is not persuaded. An overall reading of the Court's instructions indicates that such harm may depend on

the impressions of any individual or entity with "the basic human tendency to do business with a merchant or provider who offers products or services of the type and quality that the customer desires and expects. Service of a customer and a willingness to stand behind a warranty and other representations about the quality of the products or services that are sold by a merchant are all factors in the goodwill of that business." (Damages Tr. at 1268.) Nothing in the Court's language can reasonably be understood to restrict the relevant audience concerning TVT's goodwill to album purchasers, as opposed to producers, artists, or financial lenders for, as the Court indicated in its ruling on IDJ's Rule 50(a) motion, TVT's "customers" can include any such individual or entity doing business with TVT. *See TVT Records,* 262 F.Supp.2d at 190.

Furthermore, the remaining challenges to the portion of the jury's award reflecting TVT's loss of goodwill—specifically, whether the evidence was sufficient to permit the jury to arrive at a reasonable amount or quantification of the harm suffered by TVT, whether proper causation was demonstrated, and whether the harm to TVT's goodwill is supported by the evidence was reasonably within the contemplation of the parties at the time their agreement was reached—have been addressed by the Court in response to the parties' motion pursuant to Rule 50(a) set forth during the damages phase of the trial of this matter. *See TVT Records,* 262 F.Supp.2d at 190–91. The Court there sustained the portion of the jury's award reflecting a loss of goodwill, and the Court finds no basis to alter its conclusions in this regard.[16]

16. An additional piece of evidence not identified by the Court in its prior ruling that further undercuts IDJ's position that TVT demonstrated no loss of goodwill, and its position that IDJ could not have foreseen the harm to TVT's credit and, more generally, its goodwill,

To the extent that the Court's reasoning with respect to the sufficiency of the evidence concerning the *amount* of harm to TVT's goodwill and the reasonable basis for its quantification may not have been clearly indicated in its prior ruling, the Court will here provide some elaboration. Gottlieb provided at trial an extensive explanation regarding harm akin to loss of goodwill resulting from TVT's inability to release the CMC Album as anticipated. He explained the disruption to TVT's business operations and the impact on his longstanding relationship with Gotti and Ja Rule. He also explained the damage, as a result of the disruption in anticipated cash flow and expense planning, to TVT's relationship with its principal lending institution, a relationship spanning over twelve years, resulting in the loss of his credit line and TVT's inability to obtain alternative lenders. (Damages Tr. at 404–407, 434–48.) Gottlieb included various valuations for the harms suffered, and while some of those valuations addressed matters concerning, for example, lost profits, others did address goodwill. For instance, Gottlieb testified that he believed he would require $30 million to restore his credit line. (*Id.* at 437.) Overall, the evidentiary record, and in particular Gottlieb's testimony just discussed, is sufficient to permit the jury to arrive at a quantification of the harm to TVT's goodwill with reasonable certainty. The jury was free to credit Gottlieb's testimony on this matter, as it had previously done when rendering its liability verdicts against Defendants, and it is not the Court's province to re-evaluate the jury's credibility analysis in a Rule 50(b) motion. *See Nadel,* 321 F.3d at 272.

### 9. *Loss of Profits*

■ IDJ also challenges the sufficiency of the evidence in support of the jury's award of lost profits. IDJ disputes the jury's award on the basis that TVT's experts did not consider competition in the marketplace that would be present in a November 2002 release; that TVT has never marketed a hip hop album that sold two million units; that Gotti's and Ja Rule's prior successes were marketed by IDJ's affiliates and not by TVT; and that TVT's experts did not have specialized expertise in hip hop music. Each of these arguments addresses evidentiary weight, not sufficiency, and is therefore beyond the purview of the Court's present analysis. *See Nadel,* 321 F.3d at 272. IDJ also challenges the reliability of profit projections by TVT's expert, Bruce Kolbrenner ("Kolbrenner") which were in large part based on Ja Rule's and Gotti's prior success in the marketplace,[17] and attempts to cast the CMC Album project as a "new business enterprise" for TVT requiring greater precision in the calculation of lost profits than TVT demonstrated to the jury.

is the Securities and Exchange Commission Form 6–K dated March 28, 2003 filed by Vivendi Universal (the "Vivendi 6–K"), which was admitted into evidence at trial. This document reads in relevant part: "In line with the rest of the industry, UMG's revenues and profits are driven by hits, with a relatively small proportion of releases accounting for the majority of sales." (Vivendi 6–K at 161.) This concept was also echoed by the testimony of TVT's expert witness, David Berman. (Liability Tr. at 1588.) The filing also states: "The profitability of a company's recorded music business depends on its ability to attract, develop and promote recording artists, the public acceptance of those artists and the recordings released in a particular period." (Vivendi 6–K at 165.)

17. The Court had previously rejected challenges to the reliability of the projections contained in Kolbrenner's expert report, and to Kolbrenner's own expertise, in response to Defendants' motions *in limine* on this issue. *See TVT Records,* 250 F.Supp.2d at 350–51.

■ The Second Circuit has explained that under New York law,

[l]ost profits, though typically difficult to prove with exactitude, may be recovered to the extent that the evidence affords a sufficient basis for estimating their amount with reasonable certainty.... The fact that the precise amount of damage may be difficult to ascertain is not fatal to the claim, and doubts are generally resolved against the party in breach.

*Sir Speedy, Inc. v. L & P Graphics, Inc.,* 957 F.2d 1033, 1038 (2d Cir.1992) (citations omitted; internal quotations omitted); *see S & K Sales Co., v. Nike, Inc.,* 816 F.2d 843, 852 (2d Cir.1987) (noting that a plaintiff "need only provide the jury with a sound basis for approximating with reasonable certainty the profits lost ...."). The Circuit Court propounded that "[a]ny calculation of damages based on lost profits always entails a degree of uncertainty caused by the need to rely on assumptions and estimates. The mere fact that [a party] disagrees with the methodology utilized ... or [a particular] assumption ... does not render ... proof speculative." *Travellers Int'l, A.G. v. Trans World Airlines, Inc.,* 41 F.3d 1570, 1579 (2d Cir.1994) (citations omitted; internal quotations omitted) (noting that in previous cases, "statistical evidence was derived from historical operating statistics between the parties"); *see also Record Club of Am. v. United Artists Records, Inc.,* 696 F.Supp. 940, 944 (S.D.N.Y.1988) ("Although it may be improper to rely on past sales as an indicator of future sales when a more accurate measure is available, there is no support for the contention that projections of past profits is improper as a matter of law."). The Circuit Court's explanation reflects the view articulated by the New York Court of Appeals that "[d]amages resulting from the loss of future profits are often an approximation. The law does not require that they be determined with mathemati-

cal precision. It requires only that damages be capable of measurement based upon known reliable factors without undue speculation." *Ashland Mgmt. Inc. v. Janien,* 82 N.Y.2d 395, 604 N.Y.S.2d 912, 624 N.E.2d 1007, 1010–1011 (1993) (citations omitted; internal quotations omitted).

Furthermore, the Second Circuit observed as regards a new business that

a stricter standard is imposed, but ... whether the claim involves an established business or a new business ... the test remains the same, i.e., whether future profits can be calculated with reasonable certainty.... [T]he new business rule is not a per se rule forbidding the award of lost profits damages to new businesses, but rather an evidentiary rule that creates a higher level of proof needed to achieve reasonable certainty as to the amount of damages.

*Int'l Telepassport Corp. v. USFI, Inc.,* 89 F.3d 82, 85–86 (2d Cir.1996) (citations omitted; internal quotations omitted). On this point, the New York Court of Appeals declared:

a stricter standard is imposed because there is not experience from which lost profits may be estimated with reasonable certainty and other methods of evaluation may be too speculative.... Whether the claim involves an established business or a new business, however, the test remains the same, i.e., whether future profits can be calculated with reasonable certainty.

*Ashland Mgmt.,* 604 N.Y.S.2d 912, 624 N.E.2d at 1011 (citations omitted; internal quotations omitted).

The evidence introduced at trial included projections of the CMC Album's market performance based in large part on the past performance in the marketplace of releases by Ja Rule and by Gotti. As the Court indicated in its ruling in response to

Defendants' Rule 50(a) motions, such evidence included testimony by Gotti, Berman, Gottlieb, and Kolbrenner, who generally predicted sales to range between one to three million units. *See TVT Records,* 262 F.Supp.2d at 190. The matter of sufficiency of the evidence proffered for introduction at trial by TVT was previously addressed by the Court in response to Defendants' motions *in limine, see TVT Records,* 250 F.Supp.2d at 349–50, and, once this evidence was introduced, the Court reiterated its conclusions, in the context of Defendants' Rule 50(a) motions, that the evidence introduced by TVT was sufficient to sustain a jury verdict awarding lost profits, *see TVT Records,* 262 F.Supp.2d at 190–91. Since then, the jury awarded TVT damages reflecting lost profits totaling $10,389,003.00. This figure is consistent with, and indeed arguably conservative in light of, the optimistic expectations of the CMC Album's market performance by the witnesses identified above. It is reflective of the market performance figures offered by Kolbrenner corresponding to sales of two million units.[18]

The record reflects past market performance of album releases by Ja Rule and Gotti well beyond two million units. For example, while Ja Rule's November 2002 release entitled "The Last Temptation," sold only approximately 1.5 million units—in part, according to Gotti, because of content changes made as a consequence of the preliminary injunction imposed in this matter—Ja Rule's other releases produced sales of 1.3, 3.3., and 3.6 million units, individually. Gotti produced each of these albums as well as other equally successful albums by other artists. IDJ challenges the jury's reliance on the past performance of the Artists as a basis to project CMC Album sales and market performance. As a threshold matter, as the Court previously ruled, *see TVT Records,* 250 F.Supp.2d at 349, it is reasonable to rely on Gotti's and Ja Rule's past performance in the marketplace as guideposts for projecting CMC Album sales since Ja Rule is only one of three members of CMC and because Gotti has or would have produced the CMC Album. Furthermore, the record indicates that TVT, the largest independent music label in the United States, has a lengthy track record of successful album releases in various genres, and also has some experience exploiting urban or hip hop albums, though to a more limited extent.

Given this evidence, the jury's verdict awarding TVT lost profits was reasonably supported by the evidentiary record and cannot be considered unduly speculative. *See, e.g., Care Travel Co., Ltd. v. Pan Am. World Airways, Inc.,* 944 F.2d 983, 994 (2d Cir.1991) (breach of exclusive sales contract by airline entitled travel agency to lost profits calculated based on projected quotient of sales by unauthorized rival to destinations within the exclusive purview of plaintiff agency); *S & K Sales Co.,* 816 F.2d at 852 (sales during final year of contract, prior to breach, can predict future sales to determine lost profits); *Contemporary Mission, Inc. v. Famous Music Corp.,* 557 F.2d 918, 927 (2d Cir.1977) (sustaining lost profits from royalties from future record sales, based on past record sales prior to contract breach, while finding profits from collateral benefits like tours and promotions theoretically driven

---

**18.** Kolbrenner's report and testimony included projected sales figures and revenues for three alternative market performance prospects, namely, sales of one million, two million, or three million units. The jury was thus able to determine, based on the broader evidence discussed, how many units were likely to have been sold and, in turn, how much profit TVT lost due to its inability to release the CMC Album.

by such projected sales too speculative and remote); *Record Club of Am.*, 696 F.Supp. at 944 (following breach of licensing agreement granting record subscription club use of record company's catalogue of albums, record club's "lost profits equal the profits it earned under the contact in the pre-breach base period, annualized and projected throughout the life of the contract."); *PEI Export, Inc. v. Laidlaw Transit, Inc.*, No. 97 Civ. 0253E(H), 1999 WL 528801, at *4 (July 6, 1999) (plaintiff school bus reseller could rely on past sales prices and on industry reference material to establish lost profits from breach of contract by bus supplier despite absence of evidence either that plaintiff had entered into contracts to resell the undelivered busses or that plaintiff had even been approached by prospective purchasers); *Greasy Spoon, Inc. v. Jefferson Towers, Inc.*, 75 N.Y.2d 792, 552 N.Y.S.2d 92, 551 N.E.2d 585, 587 (1990) (lessee was prevented by lessor from constructing sidewalk café in violation of parties' agreement; challenge to lost profits award as unduly speculative was rejected by the New York Court of Appeals because lessee "was already operating a successful restaurant business ... [and] plaintiff's witnesses gave evidence, based upon experience, as to the level of profits that could reasonably be anticipated from the addition of a sidewalk café.... [I]n this case most of the variables that would affect the success of the thwarted business venture, i.e., location, capitalization and existing or potential clientele, were established through competent proof.").

Beyond this threshold determination, whatever the distinction between CMC, a trio including Ja Rule, and Ja Rule as a solo artist, and its implications regarding the extent to which Ja Rule's solo performance (and Gotti's involvement) can predict the market performance of the group are factual and credibility matters within the province of the jury that the Court cannot reassess in connection with Rule 50(b) motions.

For these reasons, and those set forth in the Court's prior rulings referenced above, IDJ's claim that the jury's award of lost profits is unduly speculative and unsupported by the evidence is rejected, and its motion for judgment as a matter of law on this basis is denied.

## C. DEFENDANTS' MOTIONS FOR A NEW TRIAL

Defendants advance numerous theories, pointing to various events at trial, to argue that the jury's verdict against them was the product of undue prejudice requiring a new trial. Some of the events they set forth in actuality reflect no prejudice, while others could be construed to reflect a certain amount. The 3,500 page trial record memorializes over fourteen trial days (excluding weekends and jury deliberations) during which evidence was presented and each side set forth its case to the jury. Defendants' motion papers endeavor to present a potentially convincing case by painting a picture that selectively draws together various obviously one-sided instances throughout this record. A sober review of those underlying incidents in context and of the record as a whole, however, compels the Court to find that even if some prejudice may have occurred to the detriment of both sides [19] in this litigation,

---

**19.** In its position as nonmovant, TVT is defending against allegations of prejudice and is not in a position to set forth any moments of prejudice that it believes occurred to its detriment, beyond certain categorical remarks to this effect in its papers. (*See, e.g.,* TVT's Consolidated Opposition To Defendants' Post-Trial Motions On liability Issues dated July 18, 2003 ("TVT's Liability Br.") at 31 "More fundamentally, [TVT's counsel] cannot hold a

it was not so significant, pervasive, or infectious as to constitute a basis to order a new trial.

### 1. *Trifurcation of the Trial*

Cohen argues that the jury's award of punitive damages was impermissibly tainted by the Court's refusal to divide the trial of this dispute, beyond the bifurcation of liability and damages issues, into a three phase trial to permit the jury to separately determine the availability of punitive damages and then their amount. The Court has already fully expressed its reasoning with respect to Defendants' request for trifurcation. *See TVT Records,* 257 F.Supp.2d at 746–47. The Court finds no reason to revisit this determination, which, for the reasons set forth in the Court's prior ruling on the matter, and is supported in law and compelled by the facts and, accordingly, not a basis for granting Defendants' motion for a new trial.

### 2. *Size of the Awards*

Cohen also points to the fact that the jury awarded TVT punitive damages against Cohen in the amount of $56,000,000.00, when his testimony and Statement of Net Worth indicates a net worth of approximately $29 million, as evidence of such bias and prejudice that the jury was incapable of following the Court's instructions that in fixing the amount of punitive damages, the jury should consider in part each defendant's financial resources. The significance of this apparent disparity, and the appropriate response by the Court, is addressed in and encapsulated by the Court's discussion of the Defendants' request for remittitur set forth in a separate Decision and Order issued simultaneously with the Court's ruling herein.

### 3. *References to Vivendi Universal*

■ IDJ asserts a twofold argument of prejudice from TVT's references to Vivendi Universal, IDJ's parent corporation, namely, that evidence of that company's wealth prejudiced the jury's determination of the amount of punitive damages and that such references capitalized on "heightened feelings of patriotism, and anti-French sentiments, during the war with Iraq." (Memorandum Of Law In Support Of IDJ's Motion For A New Trial Pursuant To Fed.R.Civ.P. 59 Or, At A Minimum, For Remittitur Of The Punitive Damage Awards dated June 16, 2003 ("IDJ's New Trial Br.") at 17.) The former argument is essentially a challenge to the size of the jury's verdict, and this matter is addressed in the Court's separate ruling on the Defendants' motions for remittitur mentioned above.

Of the three citations to the trial record put forth by IDJ in support of the latter argument, two only highlight references to Vivendi Universal itself and do not indicate that Vivendi Universal is a French entity. (*Id.* (citing Damages Tr. at 148–49 and 1235).) At best, the context in which these references occurred indicates merely that Vivendi Universal is an international corporation. (*See, e.g.,* Damages Tr. at 147 (referencing "Universal Music Group Worldwide").) The remaining citation, too, is mischaracterized insofar as it is attributed to TVT's counsel. In fact, the reference to Vivendi Universal being a French corporation appears in the trial testimony of a witness being questioned by TVT's counsel.

While addressing the matter of the financial impact of Defendants' actions on

candle to Defendants' counsel when it comes to speaking objections at trial." (citations to

record omitted).)

TVT, which, unlike IDJ, is an independent record company, TVT's counsel asked Gottlieb: "What has been the impact on your company's operations as a result of not being able to release the CMC album in November of 2002?" (Damages Tr. at 404.) In response, Gottlieb's answer began as follows: "The biggest—probably one of the biggest consequences is we've lost our line of credit with the bank and our credit has been ruined. An independent business doesn't rely on some big company in France to fund them. I have an 18 year track record of funding the company myself . . . ." (Damages Tr. at 404–405.)

Nothing in TVT's counsel's question in any way suggested or induced the witness to refer to Vivendi Universal as a "big company in France." Additionally, Gottlieb's characterization cannot in any reasonable way be construed as "attempting to capitalize on heightened feelings of patriotism, and anti-French sentiments, during the war with Iraq" as the Defendants claim. (IDJ's New Trial Br. at 17.) It is quite evident from the context, and indeed from the brief excerpt quoted above, that the point of identifying Vivendi Universal in this way was to highlight the smaller size of TVT to emphasize the financial consequences of Defendants' actions. The interpretation now proposed by IDJ's counsel in the context of arguing the present motion for a new trial did not occur to the Court when the statement was made, nor did it apparently occur to any of the lawyers employed by the three law firms representing Defendants in this matter, as none of them voiced an objection at the time.[20] There is no basis to presume that the jury's interpretation was any different.

Finally, the Court reiterates that the trial record contains over 3,500 pages of transcript memorializing almost three weeks (14 trial days) of testimony and argument (excluding jury deliberations). Even if the jury were to have made the link now proposed by the Defendants, the Court does not consider the reference to have engender such significant prejudice as to warrant a new trial. For these reasons, Defendants' application for a new trial on this basis must be denied.

### 4. Private Investigator

▇ Cohen also asserts as a basis for a new trial prejudice from TVT's questioning during the damages phase of a former TVT employee about telephone calls she received from a private investigator hired during the course of the present litigation by Defendants' law firm, who, reportedly, asked the witness if she had any knowledge that Gottlieb had ties with the mafia, drugs, or improper business practices. The former employee was apparently bothered by the communication and informed Gottlieb about it. TVT introduced a copy of the former employee's email communication to Gottlieb as well as testimony from her about the incident.

Before this evidence was taken, Defendants raised an objection outside of the jury's presence. Substantively, Defendants argued that this communication was not relevant because it was counsel and not Defendants who hired the investigator and because the communication occurred after litigation commenced. (Damages Tr. at 292–95.) TVT responded that, in its view, the communication "was designed to damage Mr. Gottlieb's reputation . . . and they can't now say it's prejudicial for them

---

**20.** This failure to object independently compels the Court to reject Defendants' present argument as unpreserved. *See, e.g.,* Fed. R.Evid. 103; *Schaafsma,* 802 F.2d at 636; *Palmieri,* 2000 WL 310341, at * 4; *Memorial Drive Consultants, Inc.,* 2001 WL 241781, at *6; *Hardy,* 52 F.Supp.2d at 340.

to be confronted with the acts which they did. And Mr. Cohen is the chairman of the company which hired these individuals to proceed with this and it is directly relevant to malice. It is directly relevant to an award of punitive damages." (Damages Tr. at 295.)

The Court then ruled that the testimony would be allowed given that the Defendants could explain the circumstances of the hiring of this investigator through testimony from Cohen and representatives of IDJ, particularly, whether any of them knew about the hiring of this investigator and the tactics he employed. (Damages Tr. at 296.) The Defendants' counsel then indicated that the Defendants may wish to amend their witness list to include a proper representative of their law firm who could explain the circumstances of the hiring of this investigator, to which the Court indicated that it "will allow that." (Damages Tr. at 297.) Additionally, the Court noted that a limiting instruction could be given making it clear that "if they [the jurors] find punitive damages appropriate, what conduct would be encompassed in that and make clear that there has to be a relationship to the conduct for which liability was found." (Damages Tr. at 296.)

The evidence on this matter was then received, and a limiting instruction was given, to which no objection was raised, explaining that: "The plaintiff has made a request for punitive damages on the contention that the acts of the defendants, for which you found liability, constitute reckless, wanton or malicious conduct. The testimony of the witness is allowed only for the limited purpose of establishing whether or not the defendants may have harbored that state of mind." (Damages Tr. at 383.)

The Court notes that it has previously indicated that one of the bases established by the evidence in support of the jury's finding of malice and gross, wanton, or willful behavior was the arguable manipulation of process by Defendants, namely, their eve -of-trial deliveries of putative CMC Album content and putative eve-of-trial approval of the Side Letter Agreement. In that context, the Court concluded:

> In other words, a rational jury may construe these actions as continued efforts by the Defendants to frustrate TVT"s contractual rights under the Heads of Agreement by forcing TVT to accept, under the guise of mitigation of damages, a rushed CMC Album with no meaningful opportunity by TVT to participate in or comment on its composition. A jury can therefore conclude that the public interest is furthered by punishing, and thus deterring, such conduct to protect the integrity of business dealings as well as to discourage manipulation of legal processes and forums the law creates to fairly resolve civil disputes.

*TVT Records*, 262 F.Supp.2d at 193. Similarly, the evidence concerning the investigator's conduct would relate to the question of malice and willful or wanton behavior not only to the extent that it informs of Defendants' attitudes about the circumstances surrounding the facts of the liability findings, which occurred less than three months prior to the investigator's communication, but also to the extent that the circumstances indicate a continued attitude of malice and willfulness that could reasonably be inferred from, among other things and as previously indicated, Defendants' actions occurring even as late as the eve of trial.

A limiting instruction to this basic end was given, to which no objection was raised. While neither TVT nor Defendants elicited testimony from Cohen or any IDJ employee regarding the hiring of

this investigator,[21] and while Defendants, in the end, chose not to amend their witness list as they had indicated they might, the agency relationship between Cohen and IDJ and their counsel suffices to, if nothing more, raise the possibility advanced by TVT that Defendants' might have known about the hiring of the investigator and, perhaps, his tactics. Whether or not Defendants then chose to re-raise the issue to rebut it, or, instead, simply chose, as they apparently did, not to risk reminding the jury of the matter, was a tactical decision on their part. Having weighed these options and chosen the latter approach, they cannot now attempt to also garner the benefit of the path not taken. Whether or not a fuller record on this matter could have been developed is an issue of evidentiary weight that lay squarely within the jury's province as trier of fact. The link to the underlying transaction in these ways was adequate to render the evidence relevant to the issue of malice and willful or wanton behavior. Defendants' motion for a new trial on this basis is therefore denied.

### 5. Transactional Counsel for Gotti and Murder Inc.

■ IDJ also challenges as unduly prejudicial TVT's questioning of Ron Sweeney, transactional counsel for Gotti and Murder Inc., ("Sweeney") concerning letters to Gottlieb written by Sweeney and addressing purported deliveries of CMC Album materials. In this line of questioning, TVT's counsel explored the circumstances pertaining to the delivery of putative final CMC Album materials by Sweeney—on behalf of Murder Inc.—to TVT, in particular, the fact that this delivery occurred in the form of a letter from Sweeney, a practicing attorney, to TVT, a party to this litigation, despite TVT's counsel's prior direction to Sweeney that Sweeney not contact TVT or Gottlieb without notice to TVT's counsel. (Damages Tr. at 1079–1084.) This questioning was relevant to Sweeney's credibility, particularly, whether he was acting with any bias or interest in favor of Defendants as evinced or implied by his ignoring TVT's counsel's instruction.[22] To the extent that Sweeney's actions may be construed as indicating a bias in favor of Defendants, thus implicating the weight of his testimony, any consequential harm or "prejudice" to Defendants' case is not "undue" as it was outweighed by such probity. Therefore, IDJ's motion for a new trial on this basis is denied.

### 6. Comments By TVT's Counsel

#### a. Legal Standard

■ Defendants set forth as grounds for a new trial various comments by TVT's counsel during the trial and, particularly, during his closing arguments to the jury during the liability and the damages phases of the trial of this matter. The Second Circuit has repeatedly reiterated the proper response to such challenges, instructing that "[o]bviously, not all misconduct of counsel taints a verdict to such a degree as to warrant a new trial.... Some misconduct is *de minimis* in the context of the

---

21. The Court's review of the transcript indicates no such questioning, and the Defendants identify none.

22. Sweeney is licensed to practice law in the State of California. To the extent that he may have violated the rules of professional responsibility that govern lawyers admitted to practice in California, and to the extent that he did so knowingly, such behavior would be relevant to this question of bias as well on the same theory. While Sweeney ultimately testified that he was not familiar with the applicable ethical rule on the matter, (Damages Tr. at 1082), the inquiry into the matter was not improper.

entire trial, and some is promptly dealt with by the trial court's rulings and curative instructions." *Pappas v. Middle Earth Condominium Assoc.*, 963 F.2d 534, 540 (2d Cir.1992) (finding prejudice because "[t]he combination of the overruled objection [to counsel's remark], the absence of a curative instruction, and the giving of only the standard jury charge regarding arguments of counsel could only have left [the jury] with the impression that they might properly be influenced by [the improper argument] in rendering their verdict, and thus its prejudicial effect was enhanced." (citation omitted; internal quotations omitted)). The Circuit Court has similarly explained that

> [t]rial courts possess broad discretion to determine when the conduct of counsel is so improper as to warrant a new trial. Not every improper or poorly supported remark made in summation irreparably taints the proceedings; only if counsel's conduct created undue prejudice or passion which played upon the sympathy of the jury, should a new trial be granted.

*Matthews v. CTI Container Transp. Int'l, Inc.*, 871 F.2d 270, 278 (2d Cir.1989); *accord Smith v. Nat'l R.R. Passenger Corp.*, 856 F.2d 467, 470 (2d Cir.1988) (citations omitted; internal quotations omitted). While "trial courts possess broad discretion to determine when the conduct of counsel is so improper as to warrant a new trial, ... attorneys also require latitude in formulating their arguments." *Smith*, 856 F.2d at 470 (citations omitted; internal quotations omitted).

Finally, the applicable law recognizes the important role served by sustained objections, which the jury is told to disregard as a matter of course, and curative instructions in response to arguably prejudicial or improper remarks. *See Pappas*, 963 F.2d at 540; *Jerome v. Napolitano*, No. 90 Civ. 0793(LMM), 1993 WL 22700,

at \*2 (S.D.N.Y. Jan. 26, 1993); *see also Nissho–Iwai Co., Ltd. v. Occidental Crude Sales, Inc.*, 848 F.2d 613, 619–20 (5th Cir. 1988); *Datskow v. Teledyne Continental Motors Aircraft Prods.*, 826 F.Supp. 677, 687 (W.D.N.Y.1993) ("Jurors are presumed to obey the court's instructions in this regard as in any other."). As the United States Supreme Court has held, "juries are presumed to follow their instructions." *Zafiro v. United States*, 506 U.S. 534, 540–41, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993) (citation omitted; internal quotations omitted); *accord LNC Investments, Inc. v. National Westminster Bank, N.J.*, 308 F.3d 169, 177 (2d Cir.2002); *United States v. Salameh*, 152 F.3d 88, 116 (2d Cir.1998); *Datskow*, 826 F.Supp. at 687.

### b. *Legal Limits on the Size of Punitive Damage Awards*

■ Cohen argues that the Defendants are entitled to a new trial on the basis of TVT's counsel's remark during his damages phase summation that the law generally permits punitive damages in amounts reflecting single digit multiples of compensatory damages awards. TVT's counsel's remarked as follows:

> I will submit to you that a range in which under current U.S. laws has been held to be an appropriate range of multiplying the compensatory damages by a factor in order to come to an appropriate punitive damage award is between a one and nine multiple. So you can take any of these compensatory damage numbers and multiply them times somewhere between one and nine to come up with an appropriate punitive damage number for each of these claims.

(Damages Tr. at 1240.) Whatever the extent to which this comment may or may not be inconsistent with the actual law on the matter, its significance is obviated by the Court's specific instruction to the jury

immediately after TVT's counsel's summation that it is the Court's explanation of the law, and not those offered by any of the lawyers in the case, that the jury must accept and apply. The Court explained:

> [L]et me just make a few comments by way of clarifications and limiting instructions related to the statements contained in [TVT's counsel's] closing arguments. You may have heard references to what may be factors as to the law on several matters that he may have touched upon. I have previously given instructions to you concerning any statements of counsel as to what the law is. Those statements should be disregarded. I will return to that theme within the course of my instructions and your understanding of what the law is should be [sic] only that which is contained in my instructions and not any references or assertions as to what the law is as made by counsel, neither opening or closing arguments.

(Damages Tr. at 1253.) This instruction was reiterated to the jury in general form on numerous occasions. (*See, e.g.*, Damages Tr. at 1254–55 ("On these legal matters, you must accept the law as I give it to you. To this end, both counsel have referred to what they construe to be the law. Let me underscore once again as I just [did] a few minutes ago that it is my instructions that you must follow. You must consider the law only as I instruct you and you must disregard any contrary opinion of the relevant law that may be expressed by anyone else, counsel or any member of your panel."); *accord* Liability Tr. at 1950–51.) Under the circumstances, given the Court's specific instruction to disregard TVT's counsel's statement of the law and given its repeated instructions explaining that the sole and proper source of the jury's conceptualization of any applicable law is the Court itself, the Court finds no basis to presume any prejudice from this remark and Defendants' motion for a new trial on this basis is accordingly denied.

### c. *Confidential Information and TVT's Independent Dispute with Prudential Securities Corp.*

IDJ asserts as a basis for a new trial TVT's assertion that a line of questioning concerning a dispute arising out of an independent business transaction between TVT and Prudential Securities Corp. ("Prudential") was improper because it derived from information subject to a confidentiality order. IDJ asserts that TVT's argument that IDJ was in violation of a court order of confidentiality was prejudicial, as was the attendant suggestion that IDJs' law firm[23] improperly acquired information through its representation of Prudential against TVT.

---

**23.** The law firm referenced by IDJ's present challenge is Proskauer Rose LLP ("Proskauer Rose"). To be clear, Proskauer Rose represented both IDJ and Cohen through the conclusion of the liability phase of the trial of this matter. Thereafter, Cohen obtained additional counsel from The Dontzin Law Firm LLP (the "Dontzin Firm") and the Law Offices of James M. LaRossa, LLP (the "LaRossa Firm"). Proskauer Rose never withdrew its appearance for Cohen, and references to "the Defendants' counsel" indicate Proskauer Rose in its dual capacity as counsel to both defendants. To the extent that the Court's discussion mentions "IDJ's counsel," the reference is to Proskauer Rose (and its relevant partners or associates) in this narrower capacity, and insofar as the discussion specifies "Cohen's counsel" in the context of damages trial proceedings, the reference is to The Dontzin Firm and the LaRossa Firm (and any relevant partners or associates). Additionally, to the extent that the discussion refers to "Cohen's counsel" in the context of post trial motions filed on Cohen's behalf, because the signatory of these motions is a principal of the Dontzin Firm, it is that firm that is being referenced.

The Court will discuss the latter assertion first. With respect to the suggestion that IDJ's lawyers improperly acquired information through their law firm's representation of Prudential, once their law firm was identified by the testimony, the two subsequent questions inquiring about "any concern with respect to that representation" were both objected to and sustained. (Damages Tr. at 748.) Accordingly, no answer was given. To the extent that the question posed by TVT's counsel may have been worded so as to possibly suggest or imply an improper exchange of information among lawyers at IDJ's law firm acquired from the separate representation of Prudential against TVT, the Court notes the following. First, such an implication, while conceivably inferable from the wording of the questions, was not explicitly asserted. Second, the Court sustained the Defendants' objections to both questions. Third, no answer was given. Fourth, the Court had repeatedly instructed the jury that arguments of counsel are not evidence. (*See, e.g.,* Damages Tr. at 24, 1256.) Fifth, the Court had already repeatedly instructed the jury to ignore questions for which objections posed are sustained. (*See, e.g.,* Damages Tr. at 29, 1257.) Indeed, the Court's instructions further explicitly stated that "[i]t is the answer that is the evidence and not the question posed," (Damages Tr. at 24), and that the jurors "must not draw any inference or conclusion from any unanswered question," (Damages Tr. at 29). In this context and given these instructions, the Court does not find TVT's questioning to have been prejudicial, and if so, no more than minimally.

Similar considerations also counsel the Court to conclude that the argument by TVT's counsel, set forth in his objection to questioning about material he characterized as confidential, was not unduly prejudicial. As a practical matter, TVT's counsel stated that he believed that the use of that information by Defendants' counsel was improper because it was subject to a confidentiality order issued by the New York State Supreme Court, New York County. Defendants' maintain that there was no violation of any such order because the subject matter of this line of questioning appeared in a publically filed civil complaint.

First, the Court notes that neither side has produced a copy of this order or complaint for this Court's review in considering the present issue.[24] Second, what Defendants oppose is the very substance of TVT's objection, namely, that the material addressed by their counsel's questions was subject to a confidentiality order. In other words, Defendants claim that TVT's objection itself caused them prejudice by being asserted. A Court cannot possibly sustain a challenge on prejudice grounds to the substance of an opponent's stated objection absent, perhaps, some showing of bad

---

24. TVT did submit to the Court in a letter dated August 7, 2003 a copy of a letter dated August 10, 2003 from IDJ (signed by Kempler) supposedly indicating that the Defendants did have information in their possession concerning the relationship between TVT and its relevant affiliates and Prudential that, according to TVT, went beyond the information contained in the referenced civil complaint. Nonetheless, the Court notes two points. First, less relevant is whether the Defendants possessed information beyond that contained in the referenced complaint than whether they restricted their questioning at this trial to the information that was contained in the publicly filed document. Second, perhaps ultimately determinative of this issue is whether the confidentiality order mentioned by TVT, which Defendants claimed was nonexistent as characterized, actually prohibited Defendants' use of a body of information that, regardless of its repetition elsewhere, included the actual subject matter of Defendants' questions.

faith, just because the concern being raised in the objection might have unflattering implications for the questioner. Going forward, doing so would effectively insulate parties from objections challenging and testing the reliability, propriety, and integrity of their evidence offered at trial, and that would be anathema to the adversarial process. *See, e.g., Smith,* 856 F.2d at 470 (noting that while "trial courts possess broad discretion to determine when the conduct of counsel is so improper as to warrant a new trial, ... attorneys also require latitude in formulating their arguments." (citations omitted; internal quotations omitted)).

More pointedly, however, the Court notes that Defendants' counsel engaged in a proffer of relevance regarding his line of questioning. It was at the point when he characterized in open court an independent civil complaint filed by TVT so as to allege that one of TVT's lenders was "seizing all of TVT's daily revenues," that TVT's counsel interrupted to express to the Court his disagreement with the characterization and to further indicate his view that the scope of that line of questioning was subject to a confidentiality order. (Damages Tr. at 562.) The Court promptly interrupted the discussion and directed that "[w]e cannot have this in front of the jury." (Damages Tr. at 562.) Even after this direction, Defendants' counsel nonetheless continued, stating "Your Honor, this is outrageous. This is a publically filed complaint [TVT's counsel] filed," necessitating the Court to reiterate: "No more argument." (Damages Tr. at 562.) The outburst about which IDJ complains, then, was prompted by Defendants' counsel's own proffer, which itself was made in open court and repeated even after the Court had ruled on the matter, is no less prejudicial.

While it would have been preferable for TVT's counsel to present his argument at sidebar, the Court notes that TVT's counsel, in the heat of argument, interrupted characterizations by Defendants' counsel likewise made in open court of events not in evidence. As true with respect to TVT's counsel, Defendants' counsel, knowing the sensitive content that was the subject of TVT's continuing objection, also should have articulated his proffer at sidebar. The Court's direction, quoted above, as conveyed in context at trial, was sufficient to remind the jury of its prior instruction that lawyers are under a duty to raise objections and that their arguments are not to be considered evidence, instructions that were subsequently reiterated during the Court's jury charge as well. (*See, e.g.,* Damages Tr. at 24, 29, 1256, 1257.) Under these circumstances and given the Court's instructions, the Court does not find there to have been any significant prejudice to any party sufficient to warrant a new trial.

d. *Representations Concerning IDJ's Counterclaims*

IDJ also argues that Defendants were prejudiced by testimony from Gottlieb elicited by TVT's counsel that IDJ's representations, through its counsel—namely, that IDJ would not pursue its counterclaim for tortious interference with contractual relations against TVT if TVT were to release a CMC Album following IDJ's putative consent to the project on the eve of trial—were not reliable. TVT's counsel asked: "Did you believe at any time and do you believe today that you can rely on the representations of IDJ's counsel with respect to your legal rights vis-a-vis IDJ?"(Damages Tr. at 752.) IDJ's counsel interprets the question as an attack on his and his law firm's credibility. The Court disagrees.

The significance, if any, of the question's reference to IDJ's counsel, evident in the preceding questioning, concerns the fact that the counterclaim representation in question was written by IDJ's counsel in reply to a letter addressed by TVT's counsel not to IDJ's counsel but to Murder Inc.'s transactional attorney. (Damages Tr. at 750.) At any rate, there is no basis for a reasonable inference of any suggestion of untrustworthiness on the part of IDJ's counsel as opposed to IDJ itself, for whom counsel was acting as agent in conveying the representation that IDJ would not pursue its counterclaim against TVT. In this vein, Gottlieb testified about the reason why he did not trust the representation, at least in part, asserting that it was not because IDJ's counsel was untrustworthy, but, rather, because despite the fact that the representation was made as of March 9, 2003, IDJ in fact did pursue its counterclaim against TVT during the liability phase of this litigation which commenced on March 10, 2003. (Damages Tr. at 752.) In this context, it is clear that the discussion of reliability and trustworthiness was directed at IDJ, not at IDJ's counsel which functioned as the agent through which IDJ's representation was conveyed to TVT.[25]

### e. *Enron*

██ IDJ argues that the jury was unduly prejudiced by TVT's reference during the liability phase to "Enron" and its subsequent references to a "scandal" and "cover up" and to "documents hidden." Initially, the Court notes that the first challenged reference to Enron occurred during TVT's cross-examination of Kempler, who himself first referred to Enron while being questioned on direct examination by the Defendants' counsel to draw a distinction between the actions of IDJ, which stored the signed copy of the Side Letter Agreement in Kempler's office, and Enron, which is popularly associated with destroying potentially incriminating documents. (Liability Tr. at 357 ("But I'm a little bit of a pack rat, I guess, and shredding has sort of bad connotation to me in the post-Enron world.").) During Kempler's direct and cross examinations, he testified to the effect that while IDJ did not destroy the signed copy of the Side Letter Agreement, it did store the document in Kempler's office without disclosing its existence until after the present litigation commenced. Kempler also testified that he crossed out his signature shortly after Ja Rule's employment contract with IDJ was renegotiated in August 2002. (Liability Tr. at 301–305, 315–17.) TVT's counsel mentioned Enron during his liability phase summation in the course of referencing this prior testimony to argue that the jury should reject Kempler's attempt to disavow improper or Enron-like behavior by IDJ. (Liability Tr. at 1871–72.)

Furthermore, the related remarks by TVT during summation regarding "hidden documents" referred to the fact that IDJ officials stored this signed copy of the Side Letter Agreement somewhere in Kempler's office despite efforts by TVT and its transactional counsel, Leibowitz, to receive back from IDJ executed copies of this very document, given representations that IDJ had expressed its consent and that delivery of these documents in the summer and fall of 2001 was forthcoming. (Liability Tr. at 301–305.) To convey this point, TVT's counsel stated: "We discovered that the agreement that we thought we had had been signed when we were told it had been signed. But instead of being given back to us, it had been stuck in a drawer or hidden

---

**25.** Indeed, just as this representation was contained in a letter from IDJ's counsel, it was directed to, and received on behalf of TVT by, TVT's counsel.

or there had been internal communications between Mr. Cohen saying, 'Hold off, don't give that back to them yet." ' (Liability Tr. at 1872.) This reference, and the one to a "cover up," are particularly tied to the additional point that, while the signed Side Letter Agreement was being kept at IDJ's offices, Kempler had placed a large "X" across his signature sometime in August 2002, days after Ja Rule's (and, earlier, Gotti's) employment contract with IDJ had been renegotiated. In reference to this circumstance, TVT's counsel remarked: "And it is a scandal because in order to cover up this fraud, we now have 'X's put through signatures. We have documents hidden." (Liability Tr. at 1876; *see id.* at 1872–76.)

Under these circumstances, TVT's reference to this document as having been "hidden" is not an unwarranted or unreasonable characterization, as it had a basis in the evidence.[26] The only embellishment in this phrase, then, concerns TVT's pluralization of the word, "document," which is not a basis from which to infer meaningful prejudice meriting a new trial. TVT's use of the phrase, "cover up," reflects this same circumstance in which the signed document being pursued by TVT after verbal discussions had occurred was neither delivered nor disclosed, in the face the intervening contract renegotiations with the artists, and, accordingly, arguably hidden and thus arguably "covered up." (Lia-

bility Tr. at 1872–76.) Both phrases might have an accusatory tenor, but their underlying substantive point—that the signing of a material document was not disclosed—in the face of a possible ulterior motive—namely, to placate the artists, who had expressed the desire to proceed with the CMC Album project for various reasons—also has a basis in the factual record.[27] Therefore, under the circumstances, the remarks do not reflect an unfounded and infectious degree of prejudice to the Defendants. The Court recognizes that TVT's use of the word, "scandal," is more accusatory than either of the other two phrases, but, again, the underlying events referenced had a basis in the evidence, thus mitigating any prejudicial import of this word in light of the ordinary and reasonably expected heated advocacy and puffery that characterize summations. On balance, the accusatory nature of these remarks do not present the sort of undue prejudice that would require a new trial.

### f. *Subornation of Perjury*

■ While presenting his closing argument during the liability phase, TVT's counsel also accused IDJ's and Cohen's counsel of suborning perjury from Cohen, and IDJ asserts prejudice from this event as a basis for a new trial as well. TVT defends its statement on two principal grounds. First, TVT asserts that a comparison of a sworn declaration by Cohen,

---

**26.** TVT's counsel's explanation, at sidebar following his summation, focused on the latter aspect of this underlying point, namely, the apparent tardiness of the disclosure even following the commencement of litigation and into the discovery process. Nonetheless, this explanation presented in the heat of trial certainly does not contradict what is clear from the larger context of the trial and, particularly, TVT's counsel's surrounding statements during summation, all of which make clear that the reference was to Defendants' decision not to return or acknowledge the signed Side

Letter Agreement pending the interim developments, after which Defendants assumed the very opposite view to that suggested by that document, namely, that no agreement had ever been reached, orally or otherwise.

**27.** For the reasons indicated in the Court's discussions of the sufficiency of the evidence in support of the jury's verdict during the liability phase, that argument concerning motive has ample basis in the record as well *See TVT Records,* 2003 WL 1858151, at *3–5.

in which Cohen states he told Gotti that Gotti "did not have our [IDJ's] permission to deliver or produce Ja Rule recordings to or for TVT," (Declaration of Lyor Cohen dated September 15, 2002, ¶ 19 (admitted into evidence as Plaintiff's Exhibit 50)), and of Cohen's trial testimony, in which he answered "no" to the question posed by Defendants' counsel, who asked, "Have you ever instructed him [Gotti] not to finish the CMC album project for TVT?" indicates an inconsistency providing what TVT regards as a factual basis for its counsel's remark. (Liability Tr. at 1149.) In fact, while it was proper for TVT to impeach Cohen with this inconsistency as a matter of credibility, which in fact TVT did, it was not proper for TVT to comment to the jury that Defendants' counsel suborned perjury, regardless of any apparent inconsistency in the statements, regardless of the somewhat leading question posed by counsel, and regardless of any other evidence that may or may not support the accusation. Counsel's credibility was not relevant to the jury's deliberations, Cohen's was.

Because of the impropriety of TVT's counsel's remark concerning Defendants' counsel, the Court gave a corrective instruction following TVT's summation, in which the Court stated in relevant part:

The Court does not find in this record such evidence upon which such an accusation would be reasonably justified. I therefore instruct you to entirely disregard [TVT's counsel's] remark as you deliberate on matters you are charged to determine. Like all the statements by counsel in closing arguments, such comments do not constitute evidence for your consideration. The Court did not call attention to this matter yesterday in order to assess the record and consider an appropriate response and to discuss the matter with counsel. You're admonished that you're not to draw any inferences whatsoever from the Court's action or obtain [sic] any assumption that the Court in any way endorsed [TVT's counsel's] comment.

(Liability Tr. at 1949–50.) [28]

In the face of this clear and direct instruction to completely disregard TVT's

---

**28.** TVT's closing arguments during the liability phase concluded at the end of the day on March 18, 2003. While the jury was still present, and just after TVT's summation concluded, the parties approached the bench for a sidebar discussion. In that discussion, counsel for Defendants noted his opposition to the accusation of suborning perjury on his part. In the course of his remarks, and in recognition of the lateness of the hour, counsel for Defendants remarked as follows: "And beyond that, he accused me personally of suborning perjury. That is grounds for a mistrial. I will discuss with my clients and report back to your Honor as to whether we wish to have a mistrial. But the notion that this Court will permit [TVT's counsel] to publically accuse me in front of all these people of subornating [sic] perjury is very difficult to accept. Your Honor has permitted [TVT's counsel] to violate rulings. I would request that your Honor fashion appropriate sanctions, and that tomorrow there be an appro-

priate instruction and admonition in front of the jury with respect to his accusation of me with respect to the subornation of perjury. I think it's outrageous." (Liability Tr. at 1902–1903.) The Court agreed and excused the jury until the following day, at which time the curative instruction was given. The Court, prior to excusing the jury, did instruct the jury not to commence any deliberations because the presentations of the parties had not concluded. (Liability Tr. at 1901.) In light of this instruction, and given Defendants' own request for a corrective instruction to be given on the following morning, the Court does not find the intervening night between the summation by TVT's counsel and the Court's corrective instruction to be anything more than nominally significant, particularly in light of the Court's own explanation and direction to the jury regarding why no instruction on the matter was given on the previous day.

counsel's accusation, the Court does not find the remark, in light of the overall proceedings, so prejudicial as to utterly infect Defendants' presentations and the jury's deliberations in such as a way as to compel a new trial. The Court concluded as much in response to Defendants' motion for a mistrial, which was denied in the midst of these events on the very day after TVT's summation, (Liability Tr. at 1914–16), and now reiterates its conclusions in connection with this ruling.

### g. Characterization of Materials Delivered for the CMC Album

■ IDJ also cites as a basis for finding prejudice requiring a new trial TVT's counsel's exclamation, in objection to questioning by Cohen's counsel regarding whether TVT desired to release the CMC Album, "What CMC Album? What he delivered or something real?" (Damages Tr. at 606.) In context, the relevant exchange between Gottlieb, TVT's counsel, and Cohen's counsel proceeded as follows:

Question: You don't want this album completed, do you?

Mr. Haviland: Objection, argumentative.

The Court: Recast the question, Mr. LaRossa.

Question: As you sit here now, you don't want the CMC album, do you?

Answer: I think what happened with CMC is a tragedy. I don't think there's ever—

Mr. LaRossa: Can he just answer the question?

The Court: Answer the question.

Answer: The CMC album.

Mr. Haviland: Wants what?

Mr. LaRossa: The CMC Album.

Incidentally, the Court finds no basis to accept the assertion by Defendants' counsel

Mr. Haviland: What CMC Album? What he delivered or something real?

(Damages Tr. at 606.) TVT's position—that the deliveries purporting to represent workable materials for the CMC Album were, in fact, not in final form and inadequate to create a marketable album—had already been thoroughly presented to the jury during Gottlieb's direct examination. (See, e.g., Damages Tr. at 407–423.) Furthermore, that position was reasserted by Gottlieb during cross examination seconds before the colloquy presently at issue occurred. (Damages Tr. at 605–606.) The substance of TVT's counsel's question, then, was already in evidence and was nothing new to the jury, as it represented a central tenet of TVT's arguments regarding the Defendants' conduct as relevant to malice and punitive damages. Moreover, Cohen's counsel's reference to a "CMC album," as the excerpt above indicates, was arguably unclear to the extent that it presumed a marketable product in the face of Gottlieb's position that the materials delivered were not in marketable form and that, accordingly, an actual CMC Album did not exist. An objection on grounds of argumentativeness was appropriate, and TVT's counsel made such an objection, which the Court sustained. Cohen's counsel then recast his question as directed, but the ambiguity between whether or not the delivered materials constituted a final product still remained, at which point, TVT's counsel remarked as he did. After some additional wrangling between the parties' attorneys, TVT's counsel properly phrased his objection, stating: "I have an objection to that question, your Honor. It's vague." (Damages Tr. at 608.) Finally, Gottlieb

that the Court had "permitted" TVT's, or indeed any, counsel "to violate rulings."

was able to explain the confusion, stating: "To the extent there was an album contemplated under the Heads of Agreement, no such album is currently in existence so I can't answer the question." (Damages Tr. at 608.) Following additional skirmishes between Gottlieb and Cohen's counsel, the Court finally directed Cohen's counsel as follows: "Why don't you give some more specificity as to your definition of 'the album.'" (Damages Tr. at 609.) While TVT's counsel could have raised his objection using more appropriate language, the circumstances indicate that the distinction between a marketable album (*i.e.*, "something real") and what was actually delivered was glossed by the challenged questioning. The Court finds no notable prejudice in this exchange.

### h. *Pattern of Behavior*

Cohen also generally references various elements of the trial record to set forth the proposition that "further improprieties warranting a new trial" exist. (Cohen Br. at 8.) Cohen then, as though he were proceeding *pro se,* string cites various pages in the trial record, offering no particularized basis for his putative challenges. The Court, following Cohen's lead, will not address the various citations to the record individually in search of any possible argument Cohen and his counsel might have intended to make. Rather, the Court has reviewed the contents of the pages cited, in light of the events in the record in their totality, and in this regard finds no meritorious basis for any argument for a new trial.

IDJ similarly argues that the examples it presents as bases for a new trial "are by no means exhaustive of all of [TVT's counsel's] improper conduct. Indeed, [TVT's counsel] engaged in a pattern of prejudicial questioning throughout both trials . . . ."(IDJ New Trial Br. at 17 n. 13.) The specific instances identified by IDJ are addressed elsewhere in the present Decision and Order. To the extent IDJ seeks to invoke any possible argument in support of a new trial allegedly apparent from the 3,500–page record of the fourteen-day (excluding weekends and jury deliberations) trial of this matter, the Court, taking the Defendants' lead, will generally remark that it has considered all of the parties' arguments and conducted its own independent consideration of the record in its totality and finds no meritorious basis to grant a new trial.

### 7. *Weight of the Evidence*

### a. *Basis for Finding a Breach of the Heads of Agreement*

IDJ argues that the jury's verdict of liability against Defendants for tortious interference with contractual relations is against the weight of the evidence because the Heads of Agreement provided for a November 2001 delivery date for the CMC Album materials, which was missed through no fault of Defendants, rendering any nondelivery in time for a November 2002 release inconsequential as a matter of breach. Even if a breach of the November 2002 anticipated release date is sustainable, Defendants further argue, the decision not to deliver the CMC Album materials in time was a unilateral one made by Gotti himself, without any influence by IDJ or Cohen. Without a basis for a finding of breach, the argument goes, there can be no tortious interference with contractual relations. Third, Defendants set forth the continued intentions of Gotti and Ja Rule to perform their obligations under the Heads of Agreement as weighing against a finding of breach.

With respect to the argument that Gotti and Murder Inc. breached the Heads of Agreement in November 2001, this Court has already identified evidence in support

of the conclusion that the parties to that agreement did not treat that nondelivery as a breach. *See TVT Records*, 2003 WL 1858151, at *4. Gotti continued recording material, the recording costs were submitted to TVT, TVT paid those costs, preliminary tracks were delivered by Gotti to TVT, and a photo shoot was arranged to promote the album, all well beyond November 2001 and well into 2002. *Id.* Indeed, Gotti testified that changes in release dates are not unusual in the record industry—a fact repeatedly stressed by Defendants—and that he and Gottlieb subsequently agreed to a November 2002 release date with a delivery date, by implication, sometime in early September. (Liability Tr. at 562–63.)

Rather than setting forth evidence in counterweight to this evidence, Defendants simply assert that "TVT presented no evidence that the [Heads of Agreement] was ever amended to provide for a new, firm delivery date." (IDJ New Trial Br. at 19–20.) The evidence above, in fact, does establish a clear basis to conclude that the parties to the Heads of Agreement did modify their understanding to establish a November 2002 release date, with delivery sometime in early September 2002. Therefore, the Court rejects the argument that the weight of the evidence compels against a finding of breach of the Heads of Agreement on this theory.

As regards the testimony by Gotti that he made the decision not to deliver the CMC Album materials in time for a November 2002 release, (Liability Tr. at 622), the Court notes several points. First, Gotti's testimony clearly indicates that he has a strong personality. (*See, e.g.,* Liability Tr. at 501.) Admitting deference to others—especially in the context of business decision-making—would appear inconsistent with his uncompromising artistic will and public persona. (Liability Tr. at 501

("I mean, they're partners with me, but they don't have control over nothing for Murder Inc. ... I don't know my joint venture says [sic] to the letter. But I know how we operate, and how we operate is I call the shots and they ride with what I say.")) Cohen himself acknowledged as much when explaining how delicate he had to be in voicing objections to Gotti's plans and ideas. (*See, e.g.,* Liability Tr. at 1043, 1083.) Yet, at the same time, Gotti testified that, given his business relationship with IDJ, he could not go forward with the CMC Album project with TVT absent the Defendants' consent. (Liability Tr. at 488.)

In short, given these personal and professional traits, were Gotti to yield to others as regards business or artistic decisions, he is not likely to admit it publicly. This quality somewhat undermines the ultimate weight the Court reasonably accords this aspect of Gotti's testimony, particularly when considered against evidence suggesting that, in fact, when it chose to do so, IDJ did have and exercised artistic and business control with regard to the joint venture. For example, Cohen's own testimony indicates that, at least as of April 2003, he was the person "driving" the putative completion of the CMC Album project. (Damages Tr. at 322.) Gottlieb testified that the most recent purported delivery of CMC Album materials on the eve of the damages phase contained content that did not, in his experience, reflect Gotti's fullest work, nor did they correspond to the set of CMC Album recordings deposited with the Court in February 2003. (Damages Tr. at 419, 691.) Additionally, TVT in and around April 2003 had received correspondences not from Gotti but from Kempler—on IDJ letterhead and signed on behalf of "M.I. Records, L.L.C."—addressing various matters, including which artists and songs would appear on the CMC Album, and effectively

confirming that Defendants, and not Gotti alone, were controlling the production of the CMC Album. (Damages Tr. at 412–14; Plaintiffs' Ex. 331, 332.) On balance, it is reasonable not to fully credit Gotti's assertion that he exercised complete control over business and artistic decisions concerning the CMC Album project.

In contrast, the evidence of Defendants' participation in the decision to delay the CMC Album's release and, indeed, prevent it altogether, is compelling. In addition to the evidence recounted above, evincing Defendants' more recent exercise of artistic and business control over the CMC Album project, more direct evidence includes, among other things: Cohen's statement that he had told Gotti that, at least as of late summer 2002, Gotti "did not have our [IDJ's] permission to deliver or produce Ja Rule recordings to or for TVT," (Declaration of Lyor Cohen dated September 15, 2002, ¶ 19 (admitted into evidence as Plaintiff's Exhibit 50)); and IDJ's August 14, 2002 letter to Leibowitz and TVT purporting to reject the Side Letter Agreement and refusing to permit Ja Rule and Gotti, who were under exclusive contract with IDJ, to participate in the CMC Album project. On balance, the Court does not conclude that the jury's finding of interference and breach of the Heads of Agreement induced by Defendants is against the weight of the evidence.

Finally, whether or not the Artists continue to be willing to satisfy their obligations under the Heads of Agreement is immaterial in light of the evidence, reiterated above and in response to Defendants' Rule 50(a) motions, *see TVT Records,* 2003 WL 1858151, at *1–3, that the Heads of Agreement was breached and that such breach was induced by Defendants. IDJ's motion for a new trial on this basis is accordingly rejected as well.

b. *Economic Justification*

■ IDJ also argues that IDJ, and Cohen acting on IDJ's behalf, were justified in interfering with the Heads of Agreement in light of their superior economic interest in the Artists, who were under exclusive services agreements with IDJ, and that the weight of the evidence compels this result. This argument misdefines the issue. First, the Court notes that the evidence at trial indicates that the vast majority of recording artists are bound by exclusivity arrangements with record companies and that, nonetheless, guest appearances or similar cooperative efforts, some sought and routinely approved by IDJ itself, are extremely common in the industry. *See TVT Records,* 2003 WL 1858151, at *4. The CMC Album project was no threat to IDJ's exclusivity agreements because it was one such comparable exception to these arrangements. Furthermore, TVT recognized IDJ's exclusivity rights, and, accordingly required through the Heads of Agreement, that Gotti, Ja Rule, and Murder Inc. obtain any necessary clearances from IDJ. TVT also, in this vein, pursued and, according to the jury, formed, the Side Letter Agreement with IDJ precisely to secure such permission. Accordingly, the CMC Album project is not inconsistent with IDJ's contractual relationships with the artists. Moreover, given IDJ's arrangement with TVT to share in the proceeds from the CMC Album, given the similar financial interest of one of IDJ's business partners (Gotti); and the feelings of personal loyalty expressed by IDJ's exclusive artist (Ja Rule) motivating him to pursue the CMC Album project, IDJ's interest would appear to be intertwined with the production of the CMC Album rather than inconsistent and superior to it. The weight of the evidence does not, therefore, warrant a new trial on the basis of IDJ's superior economic interest defense.

Independently, even if IDJ were to establish a superior economic interest in the matter, the jury's findings of fraud and of malice by the Defendants, findings which this Court has sustained on the evidence, *see TVT Records,* 244 F.Supp.2d at 275–77 (fraud); *TVT Records,* 2003 WL 1858151, at *4–5 (fraud); *TVT Records,* 262 F.Supp.2d at 191–93 (malice),[29] would compel a fact-finder to reject this defense. *See, e.g., MDC Corp., Inc. v. John H. Harland Co.,* 228 F.Supp.2d 387, 397 (S.D.N.Y.2002) ("Where the defendants have an economic interest in the contract ... liability will be imposed only where plaintiff can make a showing of malice on the one hand or fraudulent or illegal means on the other."); *Foster v. Churchill,* 87 N.Y.2d 744, 642 N.Y.S.2d 583, 665 N.E.2d 153, 157 (1996) ("The imposition of liability in spite of a defense of economic interest requires a showing of either malice on the one hand, or fraudulent or illegal means on the other.").

c. *Validity of the Copyright Licenses for Use of "The Rain" and "Get Tha Fortune"*

█ IDJ next argues that the jury's finding that IDJ's licenses for use of "The Rain" and "Get Tha Fortune" were invalid because they were obtained fraudulently was against the weight of the evidence. IDJ claims the benefit of the license for "The Rain" that TVT granted to Gotti, as IDJ was the distributor of the "Irv Gotti Presents: The Inc." materials. (*See, e.g.,* IDJ New Trial Br. at 23 n. 17.) IDJ also received a written license to use "Get Tha Fortune."

The jury found Defendants liable for copyright infringement despite these licenses because, implicitly, it sustained TVT's theory that the licenses were procured by fraud, namely, that Defendants from the start fraudulently concealed their intent not to permit Ja Rule and Gotti to create and deliver to TVT materials for the CMC Album. (See Jury Verdict Sheet dated March 21, 2003, Question Nos. 9–22.) In asserting its present argument, IDJ posits that there is no evidence that IDJ knew that TVT would not have granted the licenses if it knew that IDJ never intended to permit the Artists to contribute to the CMC Album as it had previously agreed to do, according to the jury (*see* Jury Verdict Sheet dated March 21, 2003, Question No. 1 (IDJ liable for breaching the Side Letter Agreement)). IDJ also argues, with respect to the license for "Get Tha Fortune," that while Gottlieb and Bryan Leach testified that TVT would not have granted this license under the circumstances, they never conveyed that message to the people within the company responsible for granting such clearances.

The evidence, however, indicates the very opposite. Specifically, the record sufficiently supports a finding that while TVT's director of business and legal affairs, Jacqueline Sussman ("Sussman"), who oversaw permissions and copyright clearances for TVT, did not have a direct conversation with Gottlieb, one of her subordinates, Manny Lorenzo, ("Lorenzo") did. Gottlieb told Lorenzo that he (Gottlieb) approved of the request by IDJ for permission to use "Get Tha Fortune," and Lorenzo conveyed that fact to Sussman, who, in turn, executed the license. (Liability Tr. at 1653, 1665.) Gottlieb himself testified that he granted the license, for a $5,000 fee, because he understood IDJ to have consented to the CMC Album project months earlier. (Liability Tr. at 1481, 1488.) Indeed, Sussman testified that when she was informed by Lorenzo that Gottlieb had approved the request for the

---

**29.** *See also* section II.B(3) *supra.*

fee to be fixed at $5,000, she believed the fee was unexpectedly low but presumed that Gottlieb must have granted permission in exchange for that amount given IDJ's collaboration with the CMC Album. (Liability Tr. at 1665.) Gottlieb also testified that the same consideration led him to consent to Gotti's use of "The Rain" on the "Irv Gotti Presents: The Inc." CD. (Liability Tr. at 1490.)

Conversely, the evidence more broadly indicates that Ja Rule and Gotti are exceedingly popular artists, that the CMC Album would have been TVT's major release for 2002 and, indeed, likely the most successful hip hop genre release ever for the company, and that there had been rather heated negotiations between TVT and IDJ, including at least one conversation between Gottlieb and Cohen directly, regarding terms of the collaboration. (*See, e.g.*, Liability Tr. at 1462–65, 1463–64, 1482–83, 1486–87.) Under these circumstances, it is reasonable to infer that had Defendants not concealed their intent not to consent to the CMC Album project— that is, had they expressed clearly their refusal to permit Gotti and Ja Rule to collaborate with TVT, thereby stopping the project—Gottlieb, once presented with IDJ's request just months later, would not turn around and help IDJ with one of its own projects, especially in light of the circumstance that the recordings for which IDJ sought TVT's license included material developed specifically for the CMC Album. The reasonableness of this inference also counsels against IDJ's former argument, namely, that no one at IDJ knew Gottlieb and TVT would have denied the license requests had IDJ not consented to the CMC Album project. At bottom, IDJ should reasonably have known that if it effectively terminated one of TVT's biggest projects (the CMC Album), that TVT would not, months later, turn around and

help IDJ with one of its own (the "Irv Gotti Presents: The Inc." releases).

## D. *TVT'S MOTION FOR RETURN, RECALL, AND DESTRUCTION OF INFRINGING MATERIALS*

■ TVT seeks from this Court an order directing IDJ to (1) turn over to TVT the master recordings of "The Rain" and "Get Tha Fortune" used in connection with the creation of the "Irv Gotti Presents: The Inc." CD and DVD; (2) issue a notice of recall to its retailers; and (3) destroy all copies of these materials that are returned by retailers and that remain in IDJ's possession or control. IDJ argues that such relief is not warranted under the circumstances of this case. The Court agrees in part with both parties.

Section 503(b) of the Copyright Act provides:

> As part of a final judgment or decree, the court may order the destruction or other reasonable disposition of all copies or phonorecords found to have been made or used in violation of the copyright owner's exclusive rights, and of all plates, molds, matrices, masters, tapes, film negatives, or other articles by means of which such copies or phonorecords may be reproduced.

17 U.S.C. § 503(b). This statute vests the Court with broad discretion to fashion appropriate equitable relief, and is a discretionary provision of the Copyright Act. *See Rogers v. Koons,* 960 F.2d 301, 313 (2d Cir.1992); *Love v. Kwitny,* 772 F.Supp. 1367, 1374–75 (S.D.N.Y.1991). TVT correctly argues, in support of its application for injunctive relief under § 503(b), that there exists presumption of irreparable harm in copyright infringement cases, *see e.g., Merkos L'inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.,* 312 F.3d 94, 96 (2d Cir.2002); *ABKCO Music, Inc. v. Stellar Records, Inc.,* 96 F.3d 60, 64 (2d

Cir.1996); *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d Cir.1985); however, relief under § 503(b) also requires a balance of equities in the movant's favor. *See Koons*, 960 F.2d at 313; *Basquiat v. Baghoomian*, No. 90 Civ. 3853(LJF), 1992 WL 125529, at *3 (S.D.N.Y. May 22, 1992); *see, e.g., Love*, 772 F.Supp. at 1375 (injunction under § 503(b) denied due to insufficient showing of harm or need). The balance of equities in this case counsel against issuing an order of recall and destruction.

The Court notes the following salient points in arriving at this conclusion. First, TVT has been awarded compensatory and statutory damages, respectively, for the Defendants' infringement of "The Rain" and "Get Tha Fortune" in the aggregate amount of $559,375.00. The jury's computation of these figures was informed by expert testimony on behalf of TVT reflecting damage estimates for the number of units of each product manufactured. The evidence was not restricted to the number of units sold, and there is no evidence that additional units have been manufactured since that testimony was received. Second, IDJ indicates that only approximately 8,000 units of the infringing products, together, remain in circulation. (Declaration of James Weatherson dated July 16, 2003, ¶ 2.) Third, other than "The Rain" and "Get Tha Fortune" on the CD and DVD, respectively, the remaining works appearing on these releases are original and non-infringing. The CD contains 13 other tracks, and "The Rain" comprises only four of seventy-eight minutes of content. (Damages Tr. at 922–23.) The DVD contains approximately two hours of content, of which "Get Tha Fortune" comprises only approximately four minutes. (Damages Tr. at 936.) Fourth, while the Defendants did make use of TVT's copyrighted materials without permission, there is no misattribution of authorship. It is clear to

consumers that "The Rain" and "Get Tha Fortune," as appearing on the "Irv Gotti Presents: The Inc." CD and DVD, reflect the work of CMC, Ja Rule, and Gotti. Similarly, these Artists obviously expended their own time and energy in creating these works, and the impact of recall and destruction warrants some consideration insofar as it may affect them. In light of these circumstances, the Court is not persuaded that the disruption of the marketplace and the burden and expense to IDJ that recalling and destroying the remaining infringing units represents are warranted.

Nonetheless, the Court does recognize that IDJ and TVT are competitors in the marketplace to some extent, and that IDJ did misappropriate copyrighted works belonging to TVT on IDJ's own releases, releases that continue—albeit in limited numbers—to exist in the marketplace. The Court also recognizes that, with regard to the master recordings of "The Rain" and "Get Tha Fortune" used to create, in part, the "Irv Gotti Presents: The Inc." CD and DVD, no further lawful use by IDJ of these materials can occur, absent TVT's permission, given TVT's copyright interest.

On balance, the Court concludes that these circumstances make appropriate an order, which the Court hereby imposes, restraining Defendants from any future production of the "Irv Gotti Presents: The Inc." CD and DVD to the extent that any such future production would include either "The Rain" or "Get Tha Fortune." The Court agrees with Defendants, who consent to such an order, (*see* The Island Def Jam Music Group's Memorandum Of Law In Opposition To TVT's Request For An Order For Recall And Destruction dated July 18, 2003 at 8), that this is a far more equitable alternative to recall and destruction and best serves the interests of

all parties. Additionally, the Court finds the nominal burden of returning to TVT its protected works as embodied in all master recordings used to create the infringing CD and DVD outweighed by the overlapping presence of TVT and IDJ in the marketplace and the continued circulation of the infringing CD and DVD, and, in the interests of equity and fairness, the Court accordingly grants TVT's request for return of these master recordings. *See, e.g., Richard Feiner and Co., Inc. v. Passport Int'l Prods., Inc.*, No. 97 Civ. 9144(RO), 1998 WL 437157, at *3 (S.D.N.Y.1998) (granting, among other relief, permanent injunction and return of master tape).

E. *TVT'S MOTION FOR PREJUDG-MENT INTEREST*

TVT requests prejudgment interest on the jury's award of damages pursuant to TVT's copyright infringement claims, and also requests that the Court fix the date on which prejudgment interest will accrue as to both the copyright infringement awards and the awards pursuant to TVT's claims under New York law. Defendants oppose the request for prejudgment interest as to either category of awards, maintaining that prejudgment interest in the copyright infringement context is not warranted by the circumstances of this case, and that TVT's request as to the common law claims is premature in light of the Court's order of remittitur.

■ Regarding the latter argument, Defendants claim that prejudgment interest would commence on the date that TVT either accepts remittitur or opts for a new trial on damages in the alternative. This contention is legally erroneous. In actuality, prejudgment interest accrues irrespective of remittitur. *See Stratton v. The Dep't for the Aging for the City of New York*, 132 F.3d 869, 876, 882 (2d Cir.1997)

(full amount of prejudgment interest accruing through date of entry of judgment was awarded despite subsequent order and acceptance by plaintiff of remittitur); *Novomoskovsk Joint Stock Co. "Azot" v. Revson*, No. 95 Civ. 5399(JSR), 1999 WL 767325, at *3 (S.D.N.Y. Sept.28, 1999) (ordering that "plaintiff shall recover against defendants ... jointly and severally, in the amount of $3,543,072.17 ... on plaintiff's fraud claim [which] represents the remitted fraud award of $2,482,333.61 plus $1,060,738.56 prejudgment simple interest calculated at a rate of nine percent per annum for the period from April 1, 1994 to December 29, 1998 [the date when judgment was entered]."); *United States v. Morganti, Inc.*, 163 F.Supp.2d 174, 202 (E.D.N.Y.2001) (same).

■ With respect to TVT's copyright claims, while the Copyright Act is silent on the matter of prejudgment interest, federal Courts of Appeals have held that such interest may be recovered. *See, e.g., McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 572–73 (7th Cir.2003) (noting presumption of prejudgment interest for federal law violations and affirming award of such interest on damages for willful copyright infringement); *Kleier Advertising, Inc. v. Premier Pontiac, Inc.*, 921 F.2d 1036, 1040–42 (10th Cir.1990) (noting presumption of prejudgment interest for federal law violations, stating that "it would be 'anomalous' to hold that a plaintiff would be entitled to recover profits flowing from infringement but not revenue generated by the use of the profits," and holding: "we pronounce the rule that prejudgment interest is available to plaintiffs under the Copyright Act."); *see also Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.*, 886 F.2d 1545, 1551–52 (9th Cir.1989) (holding that "prejudgment interest ordinarily should be awarded" on damages pursuant to claims under the

Copyright Act of 1909, 17 U.S.C. §§ 1 *et seq.* (1976 ed.) (superceded by the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.*)). The theory underlying prejudgment interest is not only to fully compensate a copyright owner for the misappropriated value of its property but also to avoid unjust enrichment by defendants, who would otherwise benefit from this component of profit through their unlawful use of another's work. *See McRoberts Software, Inc.,* 329 F.3d at 572; *Kleier Advertising, Inc.,* 921 F.2d at 1041; *Frank Music Corp.,* 886 F.2d at 1552. Courts of this District have accordingly granted prejudgment interest on awards for claims of copyright infringement, and they have done so irrespective of whether the underlying recovery is comprised of statutory damages [30] or of actual damages plus profits attributable to the infringement. *See, e.g., Softel, Inc. v. Dragon Med. & Scientific Comms., Ltd.,* 891 F.Supp. 935, 945 (S.D.N.Y.1995) (prejudgment interest on actual damages award); *Broadcast Music, Inc. v. R. Bar of Manhattan,* 919 F.Supp. 656, 661 (S.D.N.Y.1996) (prejudgment interest on statutory damages award); *Dumas v. Dagl,* No. 88 Civ. 2293(LBS), 1990 WL 258343, at *6–7 (S.D.N.Y. May 22, 1990) (prejudgment interest ordered prior to election of actual or statutory damages); *RSO Records, Inc. v. Peri,* 596 F.Supp. 849, 864 (S.D.N.Y.1984) (same).

In the case at bar, while Defendants correctly point out that TVT has been awarded compensatory and statutory damages, respectively, for Defendants' infringement of "The Rain" and "Get Tha Fortune" in the aggregate amount of $559,375.00, that figure, as reflected in the case law discussed above, is an approximation of the value of these works belonging to TVT. Defendants, according to the jury's verdict, misappropriated these works and derived a benefit comprised not only of this value but also of the interest thereon, of which, accordingly, TVT was also wrongly deprived. The Court has been presented with no reasonable basis, and itself finds none, to allocate this margin of benefit to the infringers over the copyright owner, particularly in light of the jury's findings of willfulness and malice and their underlying evidentiary bases addressed by the Court in Sections II.B(4) and II.B(6) *supra.*

Additionally, in determining whether to award prejudgment interest on awards for copyright infringement claims, courts have considered relevant the plaintiff's willingness to prosecute the infringement expeditiously. *See, e.g., In Design v. K–Mart Apparel Corp.,* 13 F.3d 559, 569 (2d Cir. 1994) (affirming denial of prejudgment interest, noting "the lack of any initiative on [the copyright owner's] part to shorten this litigation."), *abrogated in part on other grounds by Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 533–34, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994); *Antenna Tel. v. Aegean Video Inc.,* No. 95 Civ. 2328 ERK, 1996

---

**30.** IDJ contends that the theory of fully restoring a copyright owner to its rightful position and fully extracting the benefit of a defendant's misappropriation, which counsels awarding prejudgment interest, does not apply to statutory damages or to situations where actual damages include a component of a defendant's profits rather than merely the copyright owner's lost profits. The distinction, however, is unpersuasive. Each approach seeks to approximate the value of the misappropriated work, and because interest on that value exists however approximated, it belongs to the rightful beneficiary of that value—the copyright owner—rather than the infringer. To the extent that statutory damages may properly include a component of punishment and deterrence in addition to compensation, and because no apportionment of such an award as between compensatory ends on the one hand and punishment and deterrence on the other is required by the Copyright Act, the benefit of the doubt belongs with the copyright owner rather than the infringer.

WL 298252, at *14–15 (E.D.N.Y.1996) ("Factors considered by the Second Circuit ... included the size of the award and the plaintiff's willingness *vel non* to prosecute the action expeditiously.").

On this point the Court notes that TVT has consistently attempted to expedite the ultimate resolution of this dispute. For example, IDJ sent TVT its purported rejection of the Side Letter Agreement in a letter dated August 14, 2002, and TVT commenced this lawsuit promptly on August 20, 2002. TVT requested a preliminary injunction hearing one week later. (Proposed Order To Show Cause dated August 28, 2002 at 1–2.) At the conclusion of this hearing, TVT requested the earliest possible trial date available. (*See, e.g.*, Sept. 30, 2002 Hearing Transcript ("PI Tr.") at 506, 515 (TVT's counsel accepts October 28, 2002 proposed trial date over November 4, 2002, despite a prior commitment, explaining: "given the urgency to my client, I will cancel my engagement in this conference. From our vantage point, it's necessary to proceed as soon as possible."))

Defendants, by contrast, appealed the Court's preliminary injunction order, seeking—at least in part—to delay the trial date. (The Island Def Jam Music Group's Memorandum Of Law In Opposition To TVT's Motion For Attorneys' Fees dated July 18, 2003 at 6 (noting TVT's "unwarranted request for an expedited trial that led to defendants' appeal . . . ."); Letter to the Court from Michael Mervis dated October 15, 2002 at 3; Letter to the Court from Michael Mervis dated October 9, 2002 at 1–2.) While this appeal was denied, *see TVT Records v. The Island Def Jam Music Group*, No. 02–9203, slip op. at 1 (2d Cir. Nov. 15, 2002), the temporary stay of proceedings imposed by the Circuit Court while it explored the merits of the application, coupled with independent intervening developments affecting the Court's trial calendar, resulted in a considerably later trial date. TVT was also willing to waive its right to a trial by jury in order to expedite the final resolution of this dispute through a shorter bench trial. (PI Tr. at 515.) Also, when the damages phase was being scheduled at the conclusion of the liability phase, TVT requested that the damages phase commence immediately, while Defendants objected on various grounds, urging a five-week delay. *See TVT Records*, 254 F.Supp.2d at 330–31. TVT's expeditious prosecution of its case, which is reflected in these examples, also persuades the Court to award prejudgment interest in this matter.

Turning to the matter of determining the proper date on which prejudgment interest begins to accrue, TVT requests that the Court set this date to be March 21, 2003, the date the jury rendered its verdict of liability against the Defendants. TVT correctly recognizes that it is entitled to accrual as of an earlier date. (TVT's Reply Memorandum Of Law In Further Support Of Its Request For An Order Setting A Date Of Accrual Of Interest dated August 1, 2003 ("TVT PJI Reply Br.") at 8.) Under New York law, prejudgment interest on TVT's common law claims is available as of the date each cause of action accrued. *See, e.g.*, N.Y. Civ. Prac. L. & R. ("NY CPLR") § 5001(a);[31] NY CPLR § 5001(b);[32] *Baker v. Dorfman*, 239 F.3d

---

**31.** NY CPLR § 5001(a) provides: "Interest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, . . . ."

**32.** NY CPLR § 5001(b) provides: "Interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at vari-

415, 425 (2d Cir.2000) ("Courts applying [NY CPLR] § 5001(a) have without qualification awarded interest as a matter of right whenever any tortious conduct causes pecuniary damage to tangible or intangible property interests." (citation omitted; internal quotations omitted)); *Tosto v. Zelaya*, No. 99 Civ. 11864, 2003 U.S. Dist. LEXIS 8085, at *23–24 (S.D.N.Y. May 12, 2003) (prejudgment interest on recovery for fraud is available when the cause of action accrues); *Stanford Square, L.L.C. v. Nomura Asset Capital Corp.*, 232 F.Supp.2d 289, 291–94 (S.D.N.Y.2002) (awarding prejudgment interest on award for breach of contract as of the date the cause of action accrued). Similarly, prior decisions of this District have awarded prejudgment interest for copyright infringement awards as of the date of first infringement or as of the date the action was commenced. *See, e.g., Broadcast Music, Inc.*, 919 F.Supp. at 662 n. 2 (prejudgment interest on copyright infringement award calculated from date of infringement); *Bourne Co. v. Walt Disney Co.*, No. 91 Civ. 0344 (LLS), 1994 WL 263482, at *3 (S.D.N.Y. June 10, 1994) (same); *Dumas*, 1990 WL 258343, at *6

(prejudgment interest accrues as of the date the action was commenced); *RSO Records, Inc.*, 596 F.Supp. at 864 (same).

Nonetheless, TVT explains that "[t]o avoid extended litigation on a relatively ancillary issue, TVT's request errs on the side of being too late a date for the accrual of interest, rather than too early." (TVT PJI Reply Br. at 8.) TVT's decision to err on the side of caution in this way obviates the need for the Court to determine when TVT's various causes of action under New York law accrued and whether, in the exercise of its discretion, to set an earlier date regarding the copyright claims.[33] Accordingly, prejudgment interest on the entire award will accrue from March 21, 2003 through the date judgment herein was entered by the Clerk of Court. Prejudgment interest on TVT's awards pursuant to its common law claims will accrue at a rate of nine percent per annum, *see* N.Y. CPLR § 5004, and prejudgment interest on TVT's awards pursuant to its copyright infringement claims will accrue in accordance with the rate and procedure set forth in 28 U.S.C. § 1961(a),[34] *see, e.g., Bourne Co.*, 1994 WL 263482, at *3.[35]

ous times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date."

**33.** The preceding discussion of the circumstances and jury findings counseling the Court to award prejudgment interest certainly supports this conservative request for accrual as of the date of the jury's liability verdict.

Additionally, the bifurcated trial in this matter presents no basis to deviate from the approach dictated by the preceding authority. *See* N.Y. CPLR § 5002 ("Interest shall be recovered upon the total sum awarded, including interest to verdict, report or decision, in any action, from the date the verdict was rendered or the report or decision was made to the date of entry of final judgment."); *Love v. State of New York*, 78 N.Y.2d 540, 577 N.Y.S.2d 359, 583 N.E.2d 1296, 1298–99 (1991) ("In a bifurcated trial, the plaintiff's

right to be made whole becomes fixed when the verdict holding the defendant liable is rendered. . . . Accordingly, it follows that, if plaintiffs are to be fully compensated for their losses in bifurcated trials, prejudgment interest must be calculated from the date that liability is established . . . .").

**34.** TVT requests this calculus, and the Defendants do not dispute it.

**35.** The parties' arguments and TVT's present motion address matters relating to prejudgment interest only. Accordingly, nothing in the Court's present Decision and Order should be construed as foreclosing recovery of post judgment interest on the entire award to the extent otherwise available and, indeed, mandatory under 28 U.S.C. § 1961. *See Lewis v. Whelan*, 99 F.3d 542, 545 (2d Cir.1996); *Indu Craft, Inc. v. Bank of Baroda*, 87 F.3d 614, 619 (2d Cir.1996).

## IV. CONCLUSION AND ORDER

For all of the foregoing reasons, it is hereby

**ORDERED** that Defendants' motions for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure are DENIED; and it is further

**ORDERED** that Defendants' motions for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure are DENIED, subject to the Court's ruling on the Defendants' motion for remittitur as set forth in the accompanying Decision and Order; and it is further

**ORDERED** that TVT's motion for return, recall, and destruction of infringing materials is GRANTED IN PART and DENIED IN PART; and it is further

**ORDERED** that Defendants are directed to return to TVT all embodiments within their possession, custody, or control of "The Rain" and "Get Tha Fortune" on all master recordings used to create the "Irv Gotti Presents: The Inc." CD and DVD within thirty (30) days of the date of this Decision and Order; and it is further

**ORDERED** that Defendants are permanently enjoined and restrained from engaging in any future production of the "Irv Gotti Presents: The Inc." CD and DVD to the extent that any such future production would include either "The Rain" or "Get Tha Fortune;" and it is further

**ORDERED** that TVT's motion for recall and destruction of infringing materials, namely, the "Irv Gotti Presents: The Inc." CD and DVD, is DENIED; and it is further

**ORDERED** that TVT's motion for prejudgment interest is GRANTED; and it is further

**ORDERED** that prejudgment interest on all awards shall accrue as of March 21, 2003, the date of the jury's liability verdict, through the date judgment herein was entered by the Clerk of Court; that prejudgment interest on TVT's awards pursuant to its claims under New York law shall accrue at the statutory rate of nine percent per annum; that prejudgment interest on TVT's awards pursuant to its copyright infringement claims shall accrue in accordance with the procedure set forth in 28 U.S.C. § 1961(a); and that such interest is to be calculated by the Clerk of Court.

**SO ORDERED.**